Yi Long YANG, Petitioner,

v.

Alberto R. GONZALES,[1] United States Attorney General, Respondent.

Docket No. 03–4973–ag.

United States Court of Appeals, Second Circuit.

Submitted: Nov. 1, 2006.

Decided: Feb. 22, 2007.

1. Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Alberto R. Gonzales is substituted for former Attorney General John Ashcroft.

Richard Kulics, Immigration Law Center, Birmingham, MI, for Petitioner.

Robert Clark Corrente, United States Attorney for the District of Rhode Island, Robin E. Feder, Assistant United States Attorney, Providence, RI, for Respondent.

Before MINER, POOLER, and KATZMANN, Circuit Judges.

MINER, Circuit Judge.

In this proceeding Yi Long Yang petitions for review of a decision of the Board of Immigration Appeals ("BIA") affirming the decision of Immigration Judge ("IJ") Ira Sandron denying Yang's application for asylum, withholding of removal and relief under the Convention Against Torture. *In re Yi Long Yang,* No. A. 76 506 523 (B.I.A. Apr. 29, 2003), aff'g No. A 76 506 523 (Immig. Ct. N.Y. City Aug. 27, 2001). Yang is a native of China whose application is based on opposition to China's coercive population control policy. The IJ determined that Yang, who was the only witness to testify, did not give credible testimony at his hearing and that he therefore failed to carry the necessary burden of proof. In affirming the IJ and dismissing the appeal, the BIA addressed, and found wanting, Yang's arguments that he had ineffective assistance of counsel; that he was prejudiced by the fact that the last page of the transcript of the IJ's oral decision was missing; and that his testimony was not credible and therefore that his burden of proof was not sustained.

For the reasons that follow, we remand the case to the BIA for further consideration.

## BACKGROUND

I. *Application for Asylum*

In his formal application for asylum and withholding of removal, Yang, apparently

assisted by his attorney, Joseph F. Muto, Esq., subscribed to the following statement:

My name is Yi Long Yang, and I am a twenty-five years old male native of the People's Republic of China. I received eight years of education in China, and was employed in a bag factory. I fled China, and came to the United States in July 2000, as I opposed China's coercive population control policy.

Although I was not married in China, I had a girlfriend who I was intimate with. In 1997, she became pregnant and we applied for a marriage license. However, our application was rejected as my girlfriend was underage. The officials suspected that she may be pregnant, and ordered her to submit to a gynecological examination. She was taken forcibly for the examination, and upon verification of her pregnancy she was forced to submit to an involuntary abortion. Subsequent to the abortion, we were forced to pay a 3,000RMB fine. I was angry with the officials, and I became involved in a verbal altercation with them. They wanted to arrest me, but I was able to escape. I then fled China. However, I was apprehended and returned. I was incarcerated for one year, and forced to pay a 15,000RMB fine for attempting to flee China. Subsequent to my release, I was publicly criticized by the government. Finally, in May 2000, I was able to successfully escape from China.

If I am forced to return to China, I will be imprisoned and fined as I violated and opposed China's coercive population control policy. As a second time offender for illegally exiting China, I will face an enhanced period of incarceration. This punishment will be so disproportionate to the offense so as to rise to the level of persecution.

The application included a statement that Yang was employed as a worker at the Liangji Bag Factory from October 1995 to April 2000.

## II. *Testimony at the Hearing*

Yang, represented by Attorney Muto, was the sole witness to testify at the immigration hearing conducted by the IJ. He testified that he and his girlfriend, Yun Qing Weng, went to the office of his village government on August 3, 1997 to obtain a marriage certificate. Weng was pregnant at that time, and Yang stated that it was necessary for them to marry, "[o]therwise our future child wouldn't get a household registration." At the village office, following a "checkup," government officials discovered that Weng was pregnant and immediately took her to the village hospital, where an involuntary abortion was performed. No marriage certificate was issued, and Yang testified that a fine of 3,000RMB was imposed and that he did not pay the fine. He stated that, on the same day, he had a "fight" with the government officials because "they give us fine and they didn't allowed us to register for our marriage and they want to force my girlfriend to undergo abortion." Yang told the officials that both he and his girlfriend were of legal age to register for marriage but "they said according to birth control policy nobody should get pregnant before . . . they get official marriage certificate."

Yang testified that the officials forced his girlfriend into a van to take her to the hospital and that he wanted to go with her, but "they [were] pushing me away, they wouldn't let me get on the van. And then we had some fight. And they want to arrest me and then I escaped." The government officials had informed Yang that he would be arrested, causing him to run away to a relative's house to hide. Yang testified that he never returned to his job

at the bag factory and left China in November of 1997. According to Yang, his subsequent travels took him to Cambodia, then to Guatemala, and ultimately to Mexico, where he was arrested and deported to China in July of 1998.

Once back in China, Yang was arrested, accused of "illegal exits," penalized by imprisonment for one year, and fined. He testified that he did not pay the fine of 15,000RMB that was imposed "because if I didn't pay the fine they give me sentence for one year." Yang testified that he did not receive any documentation evidencing the imposition of these penalties. After his release from prison in July of 1999, Yang again sought, and was refused, permission to marry. He left China for the second time on May 18, 2000 and found his way to the United States on or about July 8, 2000. Submitted in evidence as an exhibit at the hearing was a letter dated November 7, 2000 from Weng, confirming her forced abortion and substantially corroborating Yang's testimony. In his testimony, Yang stated that an abortion certificate was issued to his girlfriend by the hospital, that a relative of his brought it to the United States, and that it was with his lawyer.

During the course of the hearing, the IJ inquired about apparent discrepancies between Yang's asylum application and his testimony. At one point, the IJ noted that the application indicated that Yang was employed in a bag factory from October of 1995 until April of 2000 and asked whether that was correct in light of Yang's testimony. Yang repeated his prior testimony that he stopped working at the factory in July of 1997. The IJ then remarked: "The Court notes [that the asylum application] was prepared with the assistance of current counsel." On another occasion, the IJ made a comment in the form of a question to Yang, noting that the asylum application stated that Yang "lived in Guantu (phonetic sp.), Lianjiang from October of 1995 until April of 2000, that's also another mistake in the application that you filed with the Court with the assistance of your attorney?" The IJ also relied upon the discrepancy between Yang's application and his testimony when he cut off counsel's inquiry about prison conditions during Yang's confinement: "There's nothing in his application that talks about any mistreatment or any problems with prison conditions, so if he talks about them now, ... it's an inconsistency with his application."

The IJ made further reference to counsel during the course of his inquiry as to the absence of documents showing deportation from Mexico. When asked why he did not provide the documents to his attorney, Yang replied: "I didn't know." The IJ then commented, apparently in an aside to Mr. Muto:

> Well counsel, we'll assume that you and your law office requested [Yang] to provide any document that you considered relevant to his claim. You have filed several. So we'll assume that your office acted competently in asking him to provide any documentation of the underlying facts of this claim.

III. *Decision of the Immigration Judge*

In an oral decision issued on August 27, 2001, the IJ concluded that "[s]ince [Yang] was not credible, it follows that any kind of application for relief must fail, including asylum, withholding of removal, and relief under the Convention against Torture." In giving his reasons for concluding that Yang lacked credibility, the IJ noted a "major inconsistency" between Yang's testimony that he stopped working for the bag company in August of 1997 and had no further employment in China, and his asylum application statement that he worked

for the bag company from October of 1995 until April of 2000. The IJ also noted a discrepancy between the asylum application statement that Yang's girlfriend was ordered to take a pregnancy test, and Yang's testimony that village officials "saw that she was pregnant" and sent her for an abortion.

Recognizing yet another inconsistency between Yang's application and his testimony, the IJ observed that Yang stated in his application that he paid fines of 3,000RMB and 15,000RMB, but testified that he never paid a fine of any kind. The IJ observed that "at the end of cross-examination, [Yang] testified that the reason he went to jail or a detention facility for the year was because he would not pay or could not pay the 15,000RMB fine, *again contrary to his asylum application.*" (Emphasis supplied).

The IJ identified another credibility problem in the fact that Yang provided no documentation to establish that he was out of China from November of 1997 to July of 1998, provided no documentation of his deportation from Mexico, and "could not give a satisfactory explanation of why he did not provide such documents to his attorney." The IJ found it to be "very implausible" that, relative to his arrest, Yang never appeared before a judge and never was served with any papers pertaining to charges against him or to his sentence when he arrived back in China in 1998, again noting that "no corroboration of any kind was furnished." The IJ classified as "highly unsatisfactory" Yang's version of the altercation between Yang and the officials who took Weng for the abortion, describing Yang's story that he ran away before the officials could apprehend him as "rather farfetched."

During the course of the issuance of his oral decision, the IJ made the following specific comments with regard to the assistance provided by Yang's counsel in the preparation of the asylum application:

> [Yang] was also inconsistent on several key points between his asylum application prepared with the assistance of current counsel and his testimony.... Again, the application was prepared with the assistance of current counsel, and we presume that it accurately reflects what [Yang's] counsel was told by [Yang] when the application was prepared and filed in court.

## IV. *The Disbarment of Joseph F. Muto, Esq.*

Joseph F. Muto, who served as Yang's attorney in the preparation of Yang's asylum application and at the hearing before the IJ, was disbarred from the practice of law in the State of New York by a Decision and Order of the Supreme Court, Appellate Division, First Department, on March 19, 2002. *See In re Muto*, 291 A.D.2d 188, 739 N.Y.S.2d 67 (N.Y.App.Div. 2002). The Departmental Disciplinary Committee ("DDC") had served Muto with a Notice and Statement of Charges charging him with forty-three counts of professional misconduct related to his immigration law practice. *Id.* at 67–68. In confirming the findings of the DDC sustaining all forty-three counts and recommending disbarment after a hearing, the Appellate Division outlined the following background facts:

> Since 1997, [Muto] has purported to specialize in representing illegal immigrants, chiefly from China, who seek political asylum in the United States. Through the testimony of several of [Muto]'s former clients and attorneys familiar with these matters, the DDC staff showed that these immigrants are brought into the United States by a series of middlemen known as "snakeheads," who hand the immigrants over

to an "agency" when they reach their destination in this country. The immigrant, lacking any knowledge of either the English language or the American legal system, then becomes completely dependent on his "agency," which provides him with a job, a place to sleep, translators, and legal representation in immigration matters. The non-lawyer "agency" generally performs the actual legal work, and retains an attorney to front for it in the Immigration Court. An attorney retained by an "agency" to represent an illegal immigrant client generally has little or no contact with the client, exercises no control over the case, and serves at the pleasure of the "agency" which pays his fee. The Referee concluded that [Muto] lent himself to this "insidious system."

*Id.* at 69.

The Appellate Division identified a number of specific instances of wrongdoing on the part of Muto, including, among other things, reliance on unsupervised non-lawyers to consult with clients and perform other legal work; undertaking representation without discussion with clients by means of a translator; undertaking representation without any meeting with clients at all; filing affidavits with the Court not signed by clients although purportedly signed by them; and failing to return original documents pertaining to his clients' asylum claims. *Id.* The Appellate Division made this pertinent observation in its decision: "Notably, although [Muto]'s neglect resulted in the entry of orders of deportation against the clients who testified in this proceeding, those clients were able to salvage their cases by retaining, at higher cost, new attorneys who made successful motions to re-open." *Id.*

## V. *Proceedings in the BIA*

In his "Brief in Support of Appeal Along With Special Request for Remand" dated March 25, 2002, present counsel for Yang advanced three separate arguments. He first contended that the IJ erred in determining that Yang was not a credible witness and argued that Yang's testimony supported the claims of asylum, withholding of removal and relief under the Convention Against Torture. Counsel also argued in the brief that the case should be remanded to the IJ because the last page of the transcription of the IJ's oral decision was missing and because Yang was prejudiced by the IJ's presumption that trial counsel for Yang was competent, a presumption rebutted by the disbarment of Mr. Muto for malpractice related to immigration matters.

The BIA responded to the appeal in a Decision dated April 29, 2003. Addressing the issue of the missing last page of the IJ's Decision, the BIA noted that only the Final Order of the IJ was contained on the page that went missing. Moreover, the BIA found that Yang knew that his application had been denied because the Order was issued orally and was appealed from; that he was provided with all the papers containing the analysis and reasoning of the IJ, enabling him to put forth his grounds for appeal; and that, by virtue of the foregoing, Yang was not prejudiced by the missing page.

With respect to Yang's claim of ineffective assistance of counsel, the BIA found inadequate grounds for remand. Specifically, the BIA determined that Yang "has not met any of the[ ] basic procedural requirements for alleging ineffective assistance of counsel and, moreover, does not allege how he was prejudiced by his former counsel's action or inaction."

Finally, the BIA determined "that the Immigration Judge properly found that [Yang] failed to meet his burden of proving that he was or will be persecuted and/or

tortured upon return to China." The BIA adopted the IJ's finding that Yang "was often vague and evasive in describing his activities in China," and found that Yang "failed adequately on appeal to explain [the] discrepancies" noted by the IJ. Also adopted was the IJ's finding that Yang lacked credibility. Accordingly, the BIA concluded: "Inasmuch as we are in agreement with the Immigration Judge, we adopt his decision and it is affirmed based upon and for the reasons set forth therein."

## ANALYSIS

### A. *Standards for the Relief Sought*

Yang here challenges the IJ's denial of asylum, withholding of removal and relief under the Convention Against Torture ("CAT"). To secure the relief of asylum, Yang "must show that he is a 'refugee' within the meaning of the Immigration and Nationality Act, *i.e.*, that he has suffered past persecution on account of 'race, religion, nationality, membership in a particular social group, or political opinion,' or that he has a well-founded fear of future persecution on these grounds." *Qiu v. Ashcroft*, 329 F.3d 140, 148 (2d Cir.2003) (quoting 8 U.S.C. § 1101(a)(42)).

Refugee status is conferred by statute upon persons who have been forced to abort a pregnancy or to undergo involuntary sterilization:

> [A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

8 U.S.C. § 1101(a)(42).

Although the statute does not specifically so provide, the BIA long has extended its benefits to spouses of those subjected to the coercive family planning policies described, while disallowing its benefits to boyfriends and fiancees. *See In re S–L–L–*, 24 I. & N. Dec. 1 (B.I.A.2006), decided following remand for clarification in *Shi Liang Lin v. U.S. Dep't of Justice*, 416 F.3d 184 (2d Cir.2005), *reh'g in banc granted* (Nov. 13, 2006). Despite the fact that Yang purports to be the unmarried male partner of a forced abortion victim, the issue of Yang's status was not addressed by the IJ or the BIA, and the government does not address it in the brief furnished to us. We note, however, that the statute itself extends the benefit of asylum to anyone who has undertaken "other resistance to a coercive population control program." 8 U.S.C. § 1101(a)(42). In any event, the question of Yang's right to seek relief as an unmarried male partner or as one who resisted the program is not before us.

While a well-founded fear of future persecution is established as a rebuttable presumption upon a showing of past persecution, the presumption may be overcome by a showing that conditions in a petitioner's country of nationality have changed sufficiently to nullify the basis for the presumption. *Qiu*, 329 F.3d at 148. In the absence of past persecution, both an objective and a subjective showing are required to establish a well-founded fear of future persecution. *Ramsameachire v. Ashcroft*, 357 F.3d 169, 178 (2d Cir.2004). The petitioner's credible testimony as to his fear can satisfy the subjective element. *Id.* The objective element requires estab-

lishment of "the context and believability" of the petitioner's claim "through presentation of reliable, specific, objective supporting evidence." *Id.* (internal quotation marks omitted). A fear is objectively reasonable "even if there is only a slight, though discernible, chance of persecution." *Diallo v. INS*, 232 F.3d 279, 284 (2d Cir. 2000) (citing *INS v. Cardoza–Fonseca*, 480 U.S. 421, 431, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)).

■ To establish withholding of removal, Yang must establish that it is more likely than not that his "life or freedom would be threatened in [China] on account of [his] race, religion, nationality, membership in a particular social group or [in his particular case] political opinion." 8 C.F.R. § 208.16(b)(1); *Ramsameachire*, 357 F.3d at 178. Once the showing is made, withholding of removal is mandatory, whereas asylum may be refused to an eligible petitioner in the discretion of the Attorney General. *See* 8 C.F.R. § 208.13(b); *Zhang v. INS*, 386 F.3d 66, 70–71 (2d Cir.2004). Because the burden attendant upon the showing necessary to establish withholding of removal is heavier than that required to establish asylum, a petitioner who cannot sustain the burden of the latter cannot ipso facto sustain the burden of the former. We have observed that "[f]orced sterilization or abortion threatens [a petitioner's] life or freedom and is a basis for withholding removal assuming that the government cannot establish changed country conditions." *Cao He Lin v. U.S. Dep't of Justice*, 428 F.3d 391, 399 (2d Cir.2005).

■ To prevail on his claim for withholding of removal under the Convention Against Torture, Yang must show that it is more likely than not that he would be tortured if removed to China. 8 C.F.R. § 208.16(c)(2). Torture is defined as "an extreme form of cruel and inhuman treatment." 8 C.F.R. § 208.18(a)(2); *see Wang v. Ashcroft*, 320 F.3d 130, 134 (2d Cir. 2003). Withholding and deferral of removal under the CAT are mandatory forms of relief that hinge on risk within the country to which the Government is seeking expulsion. *See* 8 C.F.R. §§ 208.16(c), 208.17. Instead of focusing on persecution and nexus to protected grounds, CAT relief requires the applicant to show that he or she would more likely than not be tortured, and it does not require a nexus to any ground. *See Khouzam v. Ashcroft*, 361 F.3d 161, 168 (2d Cir.2004). The difference between the two forms of CAT relief is in the protections afforded and the classes of aliens barred from relief. Withholding provides somewhat greater protection from expulsion, but certain aliens are barred from relief, *see* 8 C.F.R. § 208.16(c); deferral, on the other hand, is available to anyone who meets the standard, *see* 8 C.F.R. § 208.17. Yang apparently seeks protection under the CAT as a result of his treatment at the hands of village officials and during the service of his one-year sentence in the Chinese prison.

### B. *Standards for Review*

■ We review the factual findings of the BIA to determine whether they are supported by substantial evidence and uphold those findings unless any reasonable factfinder would have been compelled to conclude to the contrary. *Diallo*, 232 F.3d at 287. However, "when the situation presented is the BIA's application of legal principles to undisputed facts, rather than its underlying determination of those facts or its interpretation of its governing statutes," our review is de novo. *Id.*

■ We have noted that, even where deference is afforded to the BIA's construction of a statute, we will give de novo review to its application of the statute;

that we "require the BIA to elucidate the basis for its factual conclusions"; that we excuse decisions of the BIA that do not consider all factual contentions "only where the evidence in support of a factor potentially giving rise to eligibility is too insignificant to merit discussion"; and that we will vacate BIA determinations when it "either has not applied the law correctly, or has not supported its findings with record evidence." *Qiu,* 329 F.3d at 149 (internal quotation marks omitted). Of special significance to Yang's petition is our duty to assess the BIA's ruling to determine whether there was a failure to consider an important fact in the record, one that might be significant enough to merit discussion.

### C. *Ineffective Assistance of Counsel*

 The BIA rejected Yang's claim, raised on direct appeal to the BIA, of ineffective assistance of counsel. This ruling was based upon Yang's failure to comply with the requirements of *Matter of Lozada,* 19 I. & N. Dec. 637 (B.I.A.1988), *aff'd sub nom. Lozada v. INS,* 857 F.2d 10 (1st Cir.1988). We generally require that ineffective assistance claims be presented in the first instance to the BIA, either through a motion to reopen or on direct appeal. *See Arango–Aradondo v. INS,* 13 F.3d 610, 614 (2d Cir.1994). We have held that a petitioner "who has failed to comply substantially with the *Lozada* requirements ... forfeits [his] ineffective assistance of counsel claim in this Court." *Zheng v. U.S. Dep't of Justice,* 409 F.3d 43, 47 (2d Cir.2005).

 According to *Lozada,* a petition seeking relief on the basis of ineffective assistance of counsel

> must submit: (1) an affidavit setting forth in detail the agreement with former counsel concerning what action would be taken and what counsel did or did not represent in this regard; (2) proof that the [petitioner] notified former counsel of the allegations of ineffective assistance and allowed counsel an opportunity to respond; and (3) if a violation of ethical or legal responsibilities is claimed, a statement as to whether the [petitioner] filed a complaint with any disciplinary authority regarding counsel's conduct and, if a complaint was not filed, an explanation for not doing so.

*Twum v. INS,* 411 F.3d 54, 59 (2d Cir. 2005) (internal quotation marks omitted). Also required in an ineffective assistance claim is the additional requirement that the petitioner be prejudiced by the performance of counsel. *See Esposito v. INS,* 987 F.2d 108, 111 (2d Cir.1993). In addition to finding that Yang "has not met any of these basic procedural requirements for alleging ineffective assistance of counsel," the BIA found fault with Yang's failure to "allege how he was prejudiced by his former counsel's action or inaction."

 While it is true that Yang did not strictly comply with the *Lozada* requirements, it is not true that Yang did not *allege* how he was prejudiced in his representation by his former counsel. In his brief to the BIA, Yang referred to the findings of the Appellate Division in its decision disbarring Attorney Muto, including a finding that the misconduct of Mr. Muto in his Immigration Court practice demonstrated a "truly shocking disregard for his clients" and constituted "a danger to any client who might retain him." The brief noted that the IJ's reliance on the competency of counsel was called into question by the findings of the Appellate Division, and specifically alleged that Yang *"was prejudiced in this regard."* (Emphasis supplied).

As to compliance with *Lozada* in relation to claims of ineffective assistance of counsel, we have not required a slavish adher-

ence to the requirements, holding only that substantial compliance is necessary. *See Zheng*, 409 F.3d at 47. The *Lozada* requirements "serve to deter meritless claims and to provide a basis for determining whether counsel's assistance was in fact ineffective." *See Twum*, 411 F.3d at 59. Here, the facts on which Yang relies to make his claim of ineffective assistance are clear on the face of the record, which plainly shows both the IJ's explicit reliance on counsel's competence and the fact that counsel was subsequently disbarred for malpractice as an immigration attorney. We therefore conclude that Yang has substantially complied with the procedural requirements of *Lozada*, leaving the question of prejudice for determination by the BIA. *See Castillo–Perez v. INS*, 212 F.3d 518, 525–27 (9th Cir.2000) (explaining that while the *Lozada* requirements are generally reasonable under ordinary circumstances, they are not sacrosanct, and will not be dispositive when the relevant facts are plain on the face of the administrative record). Although the information surrounding Muto's disbarment was not available to the IJ because the Appellate Division's decision was not handed down until after the IJ's hearing, the BIA was entitled to take administrative notice of the decision, after it was brought to its attention, as "contents of [an] official document[ ]." 8 C.F.R. § 1003.1(d)(3)(iv).

In this case, the BIA did not refer to the disbarment decision in any way, let alone discuss its pertinence to substantial compliance with the *Lozada* requirements. In another context, we were critical of the failure of the BIA to give attention to documents "too important to ignore." *Tian Ming Lin v. U.S. Dep't of Justice*, 473 F.3d 48, 51 (2d Cir.2007) (per curiam) (internal quotation marks omitted). The Appellate Division decision was a document too important to ignore. We must remand to the BIA for consideration of this case in light of that document. But there is another reason, closely related to this one, why remand is indicated. We now turn to that reason.

### D. *Evaluation of the Evidence*

■ After evaluating the evidence given at the IJ's hearing, the BIA determined that Yang failed to carry his burden of proof that he would be persecuted or tortured on his return to China. In agreeing with the IJ's evaluation, the BIA noted the "discrepancies" in Yang's testimony and his consequent lack of credibility. The discrepancies noted were those found to exist between Yang's asylum application and his testimony before the IJ. The IJ noted a "major inconsistency" between the two in the dates of Yang's employment at a bag factory in China. He also noted discrepancies in respect of the payment of fines and as to whether Yang's girlfriend was ordered to submit to a gynecological examination or was taken immediately for a forced abortion. In his oral decision, the IJ emphasized that the asylum application was prepared with the assistance of the same counsel who represented Yang at the hearing. The IJ said that he "presume[d] that [the application] accurately reflects what [Yang's] counsel was told by [Yang] when the application was prepared and filed in court." One may at least question, in light of the Appellate Division's findings, whether that was a correct presumption. In any event, we think that it bears further examination.

The IJ relied on presumptions of the competency of counsel in other respects also. With regard to the absence of documents evidencing deportation from Mexico, the IJ, during the course of the hearing, told Yang's counsel that he "assum[ed] that your office acted competently in asking him to provide any documentation of the underlying facts of this claim." Also

during the hearing, the IJ refused to receive testimony as to the conditions of Yang's prison confinement on the ground that it was not mentioned in the application that the IJ presumed was prepared by Mr. Muto.

The IJ's finding of lack of credibility, expressly adopted, reiterated and ratified by the BIA, rests almost exclusively on the IJ's presumption that Yang's counsel acted competently. But by failing to give any consideration whatsoever to a factor bearing on that presumption, namely the findings of the Appellate Division in Muto's disbarment proceeding, the BIA failed to give attention to matters significant enough to warrant attention. *See Qiu,* 329 F.3d at 149.

### E. *Conclusion*

Because we cannot " 'confidently predict' that the agency would reach the same conclusion absent the identified errors," *Li Hua Lin v. U.S. Dep't of Justice,* 453 F.3d 99, 108 (2d Cir.2006) (footnote omitted), we are compelled to remand to the BIA. Accordingly, the petition for review is granted, and the case is remanded to the BIA for reconsideration in accordance with the foregoing. Although we are not permitted to order the taking of additional testimony in connection with our remand, *see* 8 U.S.C. § 1252(a)(1), we note that the BIA is free to so order, and we suggest that it do so in an effort to arrive at a fully informed conclusion in this case.