Catherine Angele DANKAM, Petitioner,

v.

Alberto R. GONZALES, Attorney General, Respondent.

No. 06–1277.

United States Court of Appeals, Fourth Circuit.

Argued: March 14, 2007.

Decided: July 16, 2007.

**ARGUED:** Clement Anyeh Tatoh, Immigration Assistance Center, Silver Spring, Maryland, for Petitioner. George Maralan Kelley, III, Assistant United States Attorney, Office of the United

States Attorney, Norfolk, Virginia, for Respondent. **ON BRIEF:** Bokwe G. Mofor, Silver Spring, Maryland, for Petitioner. Chuck Rosenberg, United States Attorney, Alexandria, Virginia, for Respondent.

Before MOTZ, TRAXLER, and SHEDD, Circuit Judges.

Petition for review denied by published opinion. Judge TRAXLER wrote the majority opinion, in which Judge MOTZ joined. Judge SHEDD wrote a concurring opinion.

## OPINION

TRAXLER, Circuit Judge:

Catherine Angele Dankam is a native and citizen of the Republic of Cameroon. She arrived in the United States in November 2002 as a nonimmigrant visitor for pleasure with permission to remain in the United States until April 23, 2003. Dankam overstayed her visa and received a Notice to Appear charging her as removable on this basis. *See* 8 U.S.C. § 1227(a)(1)(B). Dankam concedes removability. In October 2003, eleven months after arriving in the United States, Dankam applied for political asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). The immigration judge denied all forms of relief sought by Dankam, and the Board of Immigration Appeals ("BIA") affirmed without opinion under its streamlined review process. *See* 8 C.F.R. § 1003.1(e)(4). Dankam now petitions this court for review of the decision of the BIA. For the reasons that follow, we deny the petition for review.

### I.

#### A.

Under the Immigration and Nationality Act ("INA"), the Attorney General is vested with the discretion to grant asylum to aliens who qualify as "refugees." *See* 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A); *INS v. Ventura,* 537 U.S. 12, 13, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam). The INA defines "refugee" as someone "who is unable or unwilling to return to" his native country "because of persecution or a well-founded fear of persecution on account of ... political opinion" or other protected grounds. 8 U.S.C. § 1101(42)(A). An asylum applicant "may qualify as a refugee either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution." 8 C.F.R. § 1208.13(b). The burden of proof with respect to refugee status rests with the applicant. *See* 8 C.F.R. § 208.13(a); *Gandziami–Mickhou v. Gonzales,* 445 F.3d 351, 353 (4th Cir.2006).

■ The applicant's burden is even greater to qualify for withholding of removal to a particular country under the INA, which requires the alien to demonstrate a "clear probability of persecution" on account of a protected ground. *INS v. Stevic,* 467 U.S. 407, 430, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984) (internal quotation marks omitted). The payoff in return for the more stringent qualification standard is that withholding of removal is not a discretionary form of relief; it is mandatory. *See* 8 U.S.C. § 1231(b)(3)(A); *INS v. Aguirre–Aguirre,* 526 U.S. 415, 420, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999).

■ Finally, an alien seeking protection under the CAT must show "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). The likelihood of torture, however, need not be tied to a protected ground under the CAT. *See Yang v. Gonzales,* 478 F.3d 133, 141 (2nd Cir.2007). "Withholding and

deferral of removal under the CAT are mandatory forms of relief that hinge on risk within the country to which the Government is seeking expulsion. Instead of focusing on persecution and nexus to protected grounds, CAT relief requires the applicant to show that he or she would more likely than not be tortured, and it does not require a nexus to any ground." *Id.* (internal citation omitted).

## B.

In her application, Dankam claimed membership in the Union of Cameroon Democratic Forces ("UCDF"), a political party opposed to the Cameroonian government, and she asserted that on three occasions she suffered persecution because of her political views. According to her application, in April 2000 Dankam attended a UCDF demonstration against the killing of policemen who criticized government corruption. Allegedly, Dankam was arrested, beaten, and placed in detention at the Ndokotti Police Station for two days. Dankam asserted that during her detention, she was beaten and warned that her continued political activism would be punished harshly. Dankam indicated that her husband bribed officials to secure her release.

According to her application, the second incident occurred during a UCDF protest of the Biya government's treatment of inmates at the New Bell prison where a number of prisoners allegedly died in November 2001. After the police used water cannons, tear gas and batons to disperse the protesters, Dankam was arrested and detained for three days; the UCDF purportedly arranged for the release of a number of prisoners including Dankam. The application did not include details of her treatment during this detention and failed to specify when it occurred.

The final incident allegedly occurred on June 25, 2002, when Dankam "was distributing tracts calling for the boycott of the June 30, 2002, elections because of the failure of the ruling party . . . to create an Independent Election Commission." J.A. 61. Dankam claimed that she was arrested and again held for three days. Dankam did not provide details regarding her treatment by officials during her third detention, except to characterize the experience generally as "a living hell." J.A. 61.

Dankam asserts eligibility for asylum based on past persecution (the arrests and detentions) as well as a fear of future persecution by government agents if she returned to Cameroon "because of [her] past political activism and the persistent search by security forces after [her] departure." J.A. 66. The mistreatment purportedly feared by Dankam included "emotional distress due to intimidation and threats, arbitrary arrests and detention, mistreatment in detention," J.A. 66, and even torture "due to the fact that torture is commonly practiced by the authorities on political opponents . . . and even ordinary citizens detained for minor offenses." J.A. 67.

At the immigration hearing, Dankam testified about the three arrests noted in her asylum application. Dankam reiterated that she was arrested in April 2000 for distributing UCDF pamphlets and detained for two days at a police station in Douala. Laurent Messi, an attorney from Cameroon who enjoys political asylum in the United States, appeared at the hearing to corroborate various aspects of Dankam's testimony, including the fact of her first detention. Messi testified that he visited Dankam during the second day that she was in detention, that Dankam's release did not occur until "well after" his visit and that she spent "considerably more than two days" in prison. A.R. 124.

Dankam submitted a purported medical certificate dated April 20, 2000, indicating that she "was suffering from several swellings and wounds on the left leg" as well as "trauma and lesions of the left eye," but not explaining the cause of Dankam's injuries. A.R. 373. The April 20, 2000, medical document indicated that Dankam would be "[i]ncapacit[ated]" for forty days. A.R. 373. The record also includes an undated medical document stating that Dankam "showed symptoms of rape with swellings on the thighs, as well as lesions on the legs and knees." A.R. 371. At the hearing, however, Dankam testified that, despite her symptoms, she was not raped in prison.

Dankam confirmed the other two arrests listed in her application—one during the protest of conditions at New Bell Prison and one in June 2002. With respect to the New Bell Prison protest, Dankam's application did not provide a date; at the hearing, Dankam claimed this arrest occurred in January 2002. As for her June 2002 arrest, Dankam asserted new details about her subsequent three-day detention. According to Dankam, she was regularly beaten on the soles of her feet and forced to sit naked on a cell floor covered in urine. She testified that she was released due to the intervention of the UCDF, at which point she went into hiding in a house located near Douala and decided that she needed to leave Cameroon because her "life was in danger." A.R. 81. Dankam acknowledged, however, that she continued to report to work until August 2002, albeit not regularly because a doctor determined that she was sick and required 40 days before returning to work. In support, Dankam offered the medical certificate dated April 20, 2000. The immigration judge discounted this evidence because it clearly related to Dankam's first, not last, arrest.

Dankam indicated that her husband obtained a passport and a United States visa for her. The passport was in Dankam's own name, but she was allowed to leave Cameroon because airport authorities did not recognize her as a person wanted by the government. Dankam also testified that, although her husband and children were members of the UCDF, they were not as active as she was, and therefore it was not imperative that they flee Cameroon. Therefore, Dankam's husband and children remained behind in Cameroon when she departed for the United States.

Dankam testified that after arriving in the United States in November 2002, she continued her association with the UCDF, attending rallies and demonstrations in front of the Cameroonian Embassy in Washington, D.C., and New York. Dankam believes that her continued political activity in the United States is known to the ruling government in Cameroon through its agents located in this country. Dankam called as a witness Jules Contchou, a political asylee and a member of the UCDF in Washington, D.C. Contchou confirmed Dankam's participation in UCDF rallies in the United States and opined that her activities here were under surveillance by agents of the government in Cameroon. Contchou, however, had no personal knowledge of Dankam's arrests in Cameroon, having arrived in the United States in 1999.

In support of her claim, Dankam submitted, in addition to the aforementioned documents, a letter purportedly drafted by her husband that confirms a few major details of her story but creates a discrepancy with Dankam's testimony and written submissions regarding the date of her third arrest. The letter, dated October 27, 2003, indicated the arrest occurred on July 25, 2002, rather than June 25, 2002, as Dankam claimed. Dankam then submitted

a second letter, purportedly written by her husband on October 26, 2004, one year later and not long before her hearing, changing Dankam's final arrest date to June 25, 2002. When the discrepancy was pointed out during cross-examination, Dankam claimed that her husband wrote the second letter for the purpose of correcting the arrest date; however, the letter did not explain or acknowledge the discrepancy in dates or even refer to the first letter.

Additionally, Dankam submitted a letter from her mother confirming that Dankam was arrested three times. This letter specifically mentioned the arrests occurring on June 25, 2002, and April 18, 2000, but provided few details other than to note that Dankam was held for 48 hours in April 2000.[1]

## C.

The immigration judge found Dankam credible as to her membership in the UCDF and participation in UCDF activities after her arrival in the United States; however, the immigration judge concluded that Dankam's testimony lacked credibility "with respect to her claimed incidents of past persecution in Cameroon." J.A. 37–38. Examining the totality of the evidence, the immigration judge specifically found a number of "significant problems with [Dankam's] evidentiary presentation that reflect adversely on her credibility concerning past persecution." J.A. 38.

Accordingly, the immigration judge rejected Dankam's claim for asylum because he could not "credit [Dankam's] testimony regarding her arrests and mistreatment in Cameroon, and ... [found] her corroboration largely unreliable." J.A. 44. And, the immigration judge further determined that, under *Camara v. Ashcroft*, 378 F.3d 361 (4th Cir.2004), there was no reliable independent evidence of Dankam's past persecution in Cameroon.

Likewise, the immigration judge determined that Dankam failed to carry her burden of establishing a well-founded fear of future persecution based on Dankam's "party membership and U.S. protest activities, and the Cameroonian government's likely reaction." J.A. 44. The judge explained that "[Dankam's] threats, based on her U.S. activities, are highly speculative" since "it is not clear that the government is even well aware of [Dankam's] U.S. protest activities," and Dankam's "family members, who are also party members, although not as active as [Dankam], live undisturbed in Cameroon." J.A. 45. The immigration judge opined that these factors, coupled with Dankam's testimony that she had no difficulty departing the country under her own name, "suggest[ ] that the Cameroonian government is not overly interested in her activities." J.A. 45.

Finally, the immigration judge also rejected Dankam's claim for withholding of removal under both the INA and the CAT. The immigration judge concluded that "[b]ecause [Dankam] fails to meet the lower standard of proof for asylum, she must also fail to satisfy the higher standard for withholding of removal under Section 241(b)(3) of the [INA]." J.A. 46. *See* 8 U.S.C. § 1231(b)(3)(A). Regarding the

---

1. The translated version of the letter, which was originally in French, indicates Dankam was detained on October 18, 2000, and held for two days. The immigration judge noted that this was the only mention of an October 2000 arrest—Dankam herself made no such allegation. Thus, the judge found that this reference undercut the reliability of the document. The October 18, 2000, date, however, is merely a mistranslation. In the original french version, the date is "[l]e 18 Avril 2000," *i.e.*, April 18, 2000, which is consistent with the date identified by Dankam. J.A. 83.

claim for relief under the CAT, the judge determined that Dankam failed to demonstrate "by credible evidence" that, were she to return to Cameroon, it is more likely than not that she would be tortured. J.A. 46.

## II.

Because the BIA summarily affirmed under the streamlined review process, the decision of the immigration judge "serves as the final agency determination" and is subject to "review ... as if it were the BIA's decision." *Lin–Jian v. Gonzales,* 489 F.3d 182, 187 (4th Cir.2007); *see* 8 C.F.R. § 1003.1(e)(4).

■ The scope of our review of a final order of removal denying asylum is narrow. *See Saldarriaga v. Gonzales,* 402 F.3d 461, 465 (4th Cir.2005). The INA requires this court to uphold the BIA's final order of removal so long as it is not " 'manifestly contrary to law,' " regardless of whether the streamlined review process was used. *See Gandziami–Mickhou,* 445 F.3d at 354 (quoting 8 U.S.C. § 1252(b)(4)(C)). When the denial of asylum is based on the conclusion that the applicant failed to meet his evidentiary burden for establishing eligibility, then we review for substantial evidence and must affirm a determination of statutory ineligibility by the BIA unless the "evidence presented was so compelling that no reasonable factfinder could fail to find" eligibility for asylum. *INS v. Elias–Zacarias,* 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); *see Rusu v. U.S. INS,*

296 F.3d 316, 325 n. 14 (4th Cir.2002). In fact, "[t]o reverse the BIA's finding we must find that the evidence not only *supports* that conclusion, but *compels* it." *Elias–Zacarias,* 502 U.S. at 481 n. 1, 112 S.Ct. 812.

■ In conducting this review, we accord great deference to the agency's underlying factual findings, which are "conclusive unless any reasonable adjudicator would be compelled to find to the contrary." 8 U.S.C. § 1252(b)(4)(B). Agency findings with respect to an applicant's credibility are likewise entitled to judicial deference if such findings are supported by substantial evidence. *See Camara,* 378 F.3d at 367.

## III.

■ First, we pause briefly to address Dankam's curious lead argument. Dankam contends that the immigration judge failed to exercise his discretion properly in denying her application for asylum. Specifically, Dankam claims that the immigration judge did not consider all of the relevant factors supporting a favorable exercise of discretion.[2] In support of this particular argument, Dankam cites assorted precedents involving categories of decisions of the BIA committed solely to its discretion. *See, e.g., INS v. Abudu,* 485 U.S. 94, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988) (reviewing BIA decision denying motion to reopen deportation proceedings); *Zhao v. United States Dep't of Justice,* 265 F.3d 83, 85 (2d

---

2. The exercise of discretionary judgment with respect to a refugee's asylum claim should include the examination of "a totality of the circumstances" in view of the BIA's policy that "[t]he *danger of persecution* will outweigh all but the most egregious of adverse factors." *Huang v. INS,* 436 F.3d 89, 98 (2d Cir.2006) (internal quotation marks omitted). Considerations that are generally relevant to the exercise of discretion include "general humanitarian reasons, independent of the circumstances that led to the applicant's refugee status, such as his or her age, health, or family ties." *In re H–,* 21 I. & N. Dec. 337, 347 (BIA 1996) (en banc). Our review of discretionary denials is for abuse of discretion. *See Huang,* 436 F.3d at 96.

Cir.2001) (reviewing BIA decision denying motion to reconsider asylum petition).

■ Dankam's argument appears to rest on a misapprehension of the immigration judge's basis for denying asylum. The immigration judge clearly determined that Dankam failed to establish *statutory eligibility* for asylum; it was not a discretionary denial of asylum to an eligible applicant. Despite the fact that the ultimate decision to grant or deny asylum is committed to the discretion of the Attorney General, not every denial of asylum involves an unfavorable exercise of discretion. It is fundamental that an alien seeking asylum in the United States must demonstrate both that he is eligible under the INA for asylum and that he merits a favorable exercise of discretion. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 428 n. 6, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("[T]here is no entitlement to asylum; it is only granted to *eligible* refugees pursuant to the Attorney General's discretion.") (emphasis added); *Yousefi v. U.S. INS,* 260 F.3d 318, 327 (4th Cir.2001) (per curiam) (explaining that "once eligibility for relief was established, the Attorney General could still refuse to grant asylum").

■ In other words, an asylum claim involves two steps: "[T]he applicant has the burden to prove his or her statutory eligibility for asylum by establishing" refugee status. *Krastev v. INS,* 292 F.3d 1268, 1270 (10th Cir.2002). "Once an applicant has established his or her 'refugee' status and thus eligibility for asylum, the Attorney General exercises discretionary judgment in either granting or denying asylum." *Id.* at 1271. The immigration judge

clearly concluded that Dankam was not statutorily eligible for asylum. Dankam's claim failed to advance beyond the first step and never required an exercise of discretionary judgment. Therefore, Dankam's argument is misplaced to the extent that she believes the immigration judge abused his discretion in failing to consider various equitable factors.

### IV.

We turn now to the immigration judge's finding that Dankam failed to demonstrate refugee status based on past persecution or a well-founded fear of future persecution.

### A.

■ An applicant who successfully demonstrates that she suffered past persecution on account of a protected ground "is presumed to have [the] well-founded fear of persecution" required for refugee status. *Ngarurih v. Ashcroft,* 371 F.3d 182, 187 (4th Cir.2004); *see* 8 C.F.R. § 1208.13(b)(1).[3] The immigration judge's conclusion that Dankam failed to meet her burden of establishing past persecution rested primarily on an adverse credibility determination as to Dankam's testimony.

■ We defer to administrative credibility findings that are supported by substantial evidence, *see Camara,* 378 F.3d at 367, *i.e.,* evidence that is "reasonable, substantial, and probative ... on the record considered as a whole." *See Elias–Zacarias,* 502 U.S. at 481, 112 S.Ct. 812 (internal quotation marks omitted). An immigration judge who rejects an applicant's testimony

---

**3.** The government may rebut this presumption by establishing, through a preponderance of evidence, that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution" or that "[t]he applicant could

avoid future persecution by relocating to another part of the applicant's country" if relocation was reasonable. 8 C.F.R. § 1208.13(b)(1)(i)(A)-(B); *see* 8 C.F.R. § 1208.13(b)(ii).

on credibility grounds is obliged to offer "specific, cogent reason[s]" for doing so. *Figeroa v. INS,* 886 F.2d 76, 78 (4th Cir. 1989); *Camara,* 378 F.3d at 367. " 'Inconsistent statements' " and " 'contradictory evidence' " qualify as cogent reasons that could support an adverse credibility finding. *See Tewabe v. Gonzales,* 446 F.3d 533, 538 (4th Cir.2006) (quoting *In re S-M-J-,* 21 I. & N. Dec. 722, 729 (BIA 1997) (en banc)). We do not defer, however, to adverse credibility findings that are founded on "speculation, conjecture, or . . . unsupported personal opinion." *Id.* (internal quotation marks omitted).

▮ The adverse credibility finding in this case was based largely on the discrepancies between Dankam's testimony and the corroborative evidence she offered. First, the judge noted that Dankam submitted two letters purportedly from her husband using inconsistent dates for her final arrest, which was significant in the judge's view "because of [Dankam's] claim that it was connected with the June election fraud. A July 25, 2002, arrest would be outside of the election time frame." J.A. 38–39. The immigration judge rejected Dankam's explanation that the date used in the first letter was merely a typographical error which the second letter was offered to correct, observing that the second letter did not refer to any mistake in the previous letter and that Dankam did not address the discrepancy in dates until she was confronted with the problem on cross-examination.

Second, the testimony of Dankam and Messi conflicted regarding the length of her first detention in April 2000. Dankam claims that she was detained for two days, but Messi testified that he visited her on the second day of her detention and that she was not released until "well after" that visit. A.R. 124. In fact, Messi claimed that Dankam spent "considerably more than two days" in prison. A.R. 124. The immigration judge concluded that "[t]his is a significant discrepancy that undermines Mr. Messi's value as a corroborating witness, and casts some doubt on [Dankam's] credibility regarding her first arrest and mistreatment." J.A. 40.

Third, the immigration judge found Dankam lacked credibility in claiming that her fear of continued reprisals by the government forced her into hiding after her third arrest. The judge rested this conclusion on her admission that she continued to report for work during this time, that she was able to obtain a passport and visa in her own name during this time, and that she was able to use these documents to depart from the main airport in Cameroon without difficulty. Moreover, the immigration judge noted that Dankam's husband and oldest son continued to work and attend school in Cameroon despite their own party membership, which, in addition to Dankam's continued employment and use of travel documents bearing her name, "cast[ ] doubt on [Dankam's] claim that she was a wanted political dissident" after her last arrest and release. J.A. 40.

Fourth, the immigration judge noted that Dankam's testimony about her continued work following the third and final arrest in June 2002 was not consistent with the corroborating medical document she submitted. Dankam claimed that she continued working until August 2002—in other words, she was working while she was supposedly in hiding from the government. When asked on cross-examination to explain this apparent contradiction, Dankam claimed she did not report to work "regularly" but continued receiving pay "[b]ecause [she] had document[ed] proof that [she] was sick." A.R. 97. Specifically, Dankam testified that she was medically excused from work for 40 days; however, the medical document Dankam

provided the court was dated April 2000, around the time of Dankam's release from her first detention.

Finally, the immigration judge noted that Dankam submitted an undated medical certificate indicating that she showed "symptoms of rape." A.R. 371. Dankam denied at the hearing that she was ever raped, and speculated that she might have developed symptoms mimicking those of rape after sitting on a prison floor covered in human waste. The immigration judge discounted the value of this document therefore, observing that it seemed "unlikely that a doctor would have written a medical excuse referring to symptoms of rape in a situation where the respondent had never claimed to be raped." J.A. 41.

Dankam argues that the adverse credibility determination is not supported by substantial evidence because all of the inconsistencies specifically identified by the immigration judge are minor and not connected "to the heart" of her asylum claim. See Chen v. INS, 266 F.3d 1094, 1098 (9th Cir.2001) ("Adverse credibility determinations based on minor discrepancies, inconsistencies, or omissions that do not go to the heart of an applicant's asylum claim cannot constitute substantial evidence.").

On the contrary, most of the internal inconsistencies noted by the immigration judge were neither trivial nor unconnected to the core of Dankam's asylum claim, which is premised on the three alleged arrests and the subsequent detentions. Because the arrests are the key events underlying Dankam's claim for asylum, it follows that the details surrounding these arrests and the dates on which they occurred are more than minor or trivial details. Cf. Camara, 378 F.3d at 369 (explaining that "the misdating of Camara's miscarriage ... might have been considered a minor detail if not for the fact that

she credited it as having 'renewed her will to fight against the Conte government.' ").

We conclude that the immigration judge offered clear and cogent reasons for his adverse credibility finding. The conflicting dates for Dankam's third arrest used in the two letters purportedly from Dankam's husband were, as the immigration judge pointed out, significant because of the alleged connection between Dankam's participation in the June 2002 election and her subsequent arrest and imprisonment. Although Dankam offered a perfectly plausible explanation—that the date used in the first letter was a typographical error and the second letter was offered to correct the error—the immigration judge was entitled to reject this explanation, particularly in view of the fact that the second letter did not acknowledge an error or indicate that its purpose was to supply the correct date and Dankam did not address the issue until confronted during cross examination. Cf. Camara, 378 F.3d at 369 (concluding that inconsistencies in the applicant's testimony and corroborative documents may support an adverse credibility determination even where a plausible explanation for the discrepancies is offered). Likewise, the testimonies of Dankam and Messi were inconsistent as to a significant issue—the length of Dankam's imprisonment. And, Dankam's assertion that, following her third politically-related arrest, she was forced to go into hiding was not consistent with her continued employment at her regular place of business. See Lin–Jian, 489 F.3d at 189–90 (concluding that applicant's testimony lacked credibility where he claimed to be in hiding but continued reporting to work).

Moreover, while the few remaining inconsistencies cited by the immigration judge regarding the questions raised by the medical documents offered by Dankam as corroboration at first glance appear to

be tangential and minor, they add to and create a cumulative effect that is sufficient to support a finding that Dankam's claims are not credible. *See Lin v. Gonzales,* 446 F.3d 395, 402 (2d Cir.2006) ("[E]ven where an IJ relies on discrepancies ... that, if taken separately, concern matters collateral or ancillary to the claim, the cumulative effect may nevertheless be deemed consequential by the fact-finder.") (internal citation and quotation marks omitted).

In sum, we find that there was substantial evidence on which the immigration judge could rest his adverse credibility finding, and we conclude that Dankam has failed to show us evidence that "was so compelling that no reasonable factfinder could fail to find" that she had established eligibility for asylum. *Elias–Zacarias,* 502 U.S. at 483–84, 112 S.Ct. 812.

### · B. ·

Dankam also argues that there is independent evidence of past persecution that the immigration judge failed to credit or even consider. *See Camara,* 378 F.3d at 370. Dankam fails to specify, however, the evidence that the immigration judge supposedly overlooked. We find to the contrary—the immigration judge thoroughly reviewed the potentially corroborating evidence and determined that it was either unreliable or lacked probative value. Even the April 20, 2000, medical certificate, which the judge described as "the most reliable of the record documents on proof of mistreatment in Cameroon," failed to qualify as reliable independent evidence of Dankam's past persecution claim because it "does not establish how [her] injuries were sustained." J.A. 43.

### C.

The "well-founded fear of persecution" standard contains subjective and objective components. The subjective component requires the applicant to "present[ ] candid, credible, and sincere testimony demonstrating a genuine fear of persecution." *Chen v. U.S. INS,* 195 F.3d 198, 201 (4th Cir.1999) (internal quotation marks omitted). To satisfy the objective component, the applicant must present "specific, concrete facts that [would cause] a reasonable person in like circumstances ... [to] fear persecution." *Id.* at 202. An adverse credibility determination is generally fatal to an asylum claim alleging a well-founded fear of persecution because "the subjective element cannot generally be proved other than through the applicant's testimony." *Camara,* 378 F.3d at 369.

As noted previously, the immigration judge did not credit Dankam's testimony that her fear of future persecution forced her to go into hiding because she admitted that she continued to report to her workplace during this time. The immigration judge also rejected Dankam's activities in the United States as a basis for finding a well-founded fear of persecution. As the immigration judge pointed out, there is nothing in the record showing that the government in Cameroon is keeping tabs on Dankam, and testimony to the contrary from Dankam and Contchou amounted to nothing more than unsupported speculation.

We conclude the immigration judge offered sufficiently cogent reasons to support the adverse credibility determination. *See Lin–Jian,* 489 F.3d at 189–90; *see Chen v. United States Dep't of Justice,* 471 F.3d 315, 336 n. 16 (2d Cir.2006) (affirming the rejection of asylum applicant's claim that she continued reporting to work while she was purportedly hiding from officials because "[t]he purpose of going into ... hiding is to avoid the officials, and yet petitioner's workplace was the very first place those officials would have searched for petitioner other than her home") (inter-

nal quotation marks omitted). Again, we see no evidence that is "so compelling that no reasonable factfinder could fail to find" that Dankam has established eligibility for asylum. *Elias–Zacarias,* 502 U.S. at 483–84, 112 S.Ct. 812.

### D.

Dankam seeks withholding of removal under the INA as an alternative to asylum. *See* 8 U.S.C. § 1231(b)(3). The "clear probability" of persecution standard that applies to this form of relief is more stringent than the eligibility standard for asylum. Thus, Dankam's failure to establish eligibility for asylum necessarily means she cannot demonstrate eligibility for withholding of removal under the INA. *See, e.g., Ngarurih,* 371 F.3d at 189 n. 7. Accordingly, we also deny Dankam's petition for review of the decision of the immigration judge as it pertains to the withholding of removal claim.

### V.

Finally, Dankam requests relief under the CAT in the form of with-holding of removal. In denying relief, the immigration judge indicated that he was unable to "find that [Dankam] has shown, by credible evidence, that she meets the higher standard showing that it is more likely than not she will be tortured, for any reason, if returned to Cameroon." J.A. 46. We review the denial of relief under the CAT for substantial evidence. *See Rashiah v. Ashcroft,* 388 F.3d 1126, 1131 (7th Cir.2004). Dankam failed in her brief and at oral argument to identify any evidence that suggests she will "more likely than not" be tortured if removed to Cameroon, and we have found no such evidence in this record. *See* 8 C.F.R. § 1208.16(c)(2). Accordingly, we conclude that substantial evidence supports the decision of the immigration judge denying CAT relief based on

Dankam's failure to carry her burden of proof.

### VI.

For the foregoing reasons, we deny Dankam's petition for review.

*PETITION FOR REVIEW DENIED*

SHEDD, Circuit Judge, concurring:

I concur in the result reached by the majority. I write separately simply to address the analysis employed by the IJ in evaluating Dankam's credibility with respect to past persecution. Part IV.A. of the majority opinion accurately recounts the five reasons given by the IJ in support of his determination that Dankam lacked credibility regarding her alleged past persecution. Each of these five bases for the adverse credibility determination was premised on some alleged contradiction or inconsistency between Dankam's testimony and other evidence she offered. As a general rule, inconsistencies and contradictions in an applicant's testimony or documentary evidence amount to cogent reasons sufficient to support an adverse credibility determination. *Tewabe v. Gonzales,* 446 F.3d 533, 538 (4th Cir.2006). However, in this case, two of the bases for the IJ's adverse credibility determination strike me as enhancing Dankam's credibility, not undermining it.

Specifically, the IJ focused on inconsistencies between Dankam's testimony and the testimony given by Messi regarding the length of her incarceration; *i.e.,* Dankam claimed that her incarceration in 2000 lasted merely two days, while Messi asserted that she was incarcerated for "considerably more than two days." J.A. 124. Also, the IJ pointed out that Dankam claimed she had not been raped in prison, despite her own medical documentation in-

dicating that she had symptoms consistent with rape.\* In each of these instances, Dankam's testimony is less sensational than the allegedly *conflicting* evidence: she claims that she was imprisoned for only two days, not more; she claims that she was subjected to inhumane conditions, not raped. In short, rather than bolstering her asylum claim by embellishing her story, Dankam's testimony suggests a more plausible explanation by resisting the urge to exaggerate, even at the cost of possibly contradicting other evidence. Much like an out-of-court statement against one's own interest implies an intrinsic reliability sufficient to justify its admission under Federal Rule of Evidence 804(b)(3), Dankam's statements, which had potentially adverse implications for her asylum claim, carry an inherent ring of truth. Thus, in my view, to the extent these two statements by Dankam were inconsistent with other evidence offered at the hearing, they actually support her credibility instead of detracting from it. In cases such as this, where inconsistencies seem to militate in favor of an applicant's credibility, the IJ should explain why the inconsistencies render the applicant's testimony incredible.

Nevertheless, the additional grounds espoused by the IJ, as well as the other evidence in the record, provide substantial evidentiary support for the adverse credibility determination with respect to past persecution. Moreover, my review of the record reveals no evidence that would compel a result contrary to the one reached by the IJ and the Board of Immigration Appeals. *See INS v. Elias–Zacarias,* 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) ("To reverse the BIA finding we must find that the evidence not

only *supports* that conclusion, but *compels* it. . . ."). Accordingly, I concur in the result reached by the majority.

---

\* I note that Dankam's testimony, which stated she had not been raped, did not actually contradict the medical document, which merely indicated that she "showed *symptoms* of rape. . . ." J.A. 371 (emphasis added). Thus, I believe that characterizing Dankam's testimony as inconsistent with the medical document is not necessarily accurate.