04-0309-ag
Piranej v. Mukasey

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Submitted: September 6, 2007                    Decided: February 15, 2008)

Docket No. 04-0309-ag

_____

ARTUR PIRANEJ,

*Petitioner*,

v.

MICHAEL B. MUKASEY,[1]

*Respondent*.

_____

Before: WALKER, CALABRESI, and SACK, *Circuit Judges*.

_____

Petition for review of the December 17, 2003 denial, by the Board of Immigration Appeals ("BIA"), of a motion to reopen deportation proceedings based on ineffective assistance of counsel.

Petition granted. Vacated and remanded.

_____

> Visuvanathan Rudrakumaran, Law Office of V. Rudrakumaran, New York, N.Y., *for Petitioner*.
>
> Hillel R. Smith, Trial Attorney, Office of Immigration Litigation (Peter D. Keisler, Assistant Attorney General, Greg D. Mack, Senior Litigation Counsel, *on the brief*), Washington, D.C., *for Respondent*.

---

[1] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Michael B. Mukasey has been substituted for former Attorney General John Ashcroft as the respondent in this case.

_____

CALABRESI, *Circuit Judge*:

Petitioner Artur Piranej ("Piranej" or "Petitioner") alleges that but for the ineffective assistance of his counsel, he would have been able to adjust his status to that of a lawful permanent resident and thus avoid deportation. Based on that claim, he filed a motion before the Board of Immigration Appeals ("BIA") to reopen his removal proceedings. The BIA denied the motion, finding that Piranej had failed to meet certain of the pleading requirements set out in *In re Lozada*, 19 I. & N. Dec. 637, 639 (B.I.A. 1988) – specifically that of alleging in detail the agreement he had with counsel and how that agreement was violated.

Piranej's affidavits and submitted materials before the BIA, however, can be read to assert that he and his counsel were in a relationship similar to that of a general retainer agreement, and that, due to the nature of this relationship, the lawyer should have provided Piranej with timely advice about new opportunities for adjustment of status. Because the prospect of a "general retainer agreement" is not one which the language of *Lozada* contemplates, we find that the BIA abused its discretion in rejecting Petitioner's ineffective assistance of counsel claim without a more thorough factual examination and, if such an examination warranted it, a consideration of the meaning and applicability of the *Lozada* requirements in the context of general retainer agreements.

We therefore remand this case to the BIA with instructions to remand it to an Immigration Judge ("IJ") for fact-finding on the exact parameters of the relationship between Piranej and his lawyer. The IJ and BIA should then determine, in the first instance, whether the understanding between Piranej and his lawyer serves the functions embodied in *Lozada*'s

2

"agreement" requirement, and whether, in light of that determination, Piranej's allegations have substantially complied with this requirement.

## BACKGROUND

### I. Underlying Events

Artur Piranej, a citizen of Albania, entered the United States on or about July 31, 1998. In August of that year, Piranej, with the assistance of James Hakanjan, a member of an "immigration service," who was "familiar with how these applications are filled out," attempted to file an asylum claim. The application was apparently improperly filled out and, on this basis, was denied. On September 30, 1998, Piranej was served with a Notice to Appear. As an alien inadmissible due to invalid entry documentation, he was charged with removability. 8 U.S.C. § 1182(a)(7)(A)(i)(I).

At that point, Piranej hired James Lombardi as his lawyer. At a hearing before an IJ in December of that year, Piranej, with counsel present,[2] conceded his removability and sought political asylum and withholding of removal. On March 9, 1999, his petitions for relief were denied by the IJ, and he was ordered removed. Lombardi, on behalf of Piranej, filed a timely appeal to the BIA, which affirmed the IJ's decision without opinion on February 13, 2003. *In re Piranej*, No. A76 085 301 (B.I.A. Feb. 13, 2003), *aff'g* No. A76 085 301 (Immig. Ct. N.Y. City Mar. 9, 1999). The BIA's decision was not appealed to this Court.

### II. Motion To Reopen Before the BIA

In May 2003, Piranej, represented by new counsel, filed a motion to reopen his deportation hearings on the ground that he received ineffective assistance of counsel. He argued

---

[2] Lombardi was not present at this hearing but sent his associate, Christopher Enzuro.

that but for Lombardi's negligence, Piranej would have been able to adjust his status to that of a permanent resident and thus avoid deportation. In submitting his motion to the Board, Piranej provided an affidavit alleging prejudice due to Lombardi's ineffective assistance and outlining aspects of their attorney-client relationship. Piranej also submitted the complaint that he had filed with the Departmental Disciplinary Committee, as well as evidence that Lombardi had been informed of the allegations against him and been given an opportunity to respond.

*A. The Alleged Ineffective Assistance of Counsel*

Shortly after arriving in the United States, in the autumn of 1998, Piranej met Bukurije Neza. At Piranej's asylum hearing on March 9, 1999, Neza, a U.S. citizen, was identified as Artur Piranej's fiancée. After the hearing, Piranej told his lawyer, Lombardi, that he and Neza wanted to get married. Lombardi allegedly advised them not to do so, saying "it would hurt their case."[3]

In early 1999, the availability of adjustment of status based on a marriage to an American citizen was limited by 8 U.S.C. § 1154(g), which states that "a petition may not be approved to grant an alien immediate relative status or preference status by reason of a marriage which was entered into during the period [in which administrative or judicial proceedings are pending regarding the alien's right to be admitted or remain in the United States], until the alien has resided outside the United States for a 2-year period beginning after the date of the marriage." A waiver, provided in Immigration and Nationality Act ("INA") section 245(i), 8 U.S.C. § 1255(i),

---

[3] Lombardi disputes this characterization of the conversation and has stated that he "did not tell them that they should not get married."

allowing certain aliens to remain in the United States while adjusting their status, had expired in January 1998.[4]

Piranej and Neza still wanted to get married, "regardless of the outcome of [the] case." And to this end, in February 2001, Neza called Lombardi "[t]o be on the safe side." She left a message with someone, identified by Neza as a secretary, that Neza needed to talk with Lombardi, as she and Piranej were planning on getting married soon. Lombardi did not return the phone call, and Neza and Piranej assumed from this silence that it would be "all right for [them] to get married." On March 20, Piranej and Neza were married. Following the wedding, Neza again called Lombardi's office and spoke to an unidentified woman who answered the phone. Neza told this woman that she and Piranej were now married and that she "would like to talk to Mr. Lombardi and ask him what [they] should do next." Again, Lombardi did not return Neza's call.

In July 2002, after "having called Mr. Lombardi's office many more times and receiv[ing] no response from him," Artur Piranej went to the office, without an appointment, and asked to see Lombardi. He met with Lombardi and announced his intention to find another attorney to take action on his case, stating that on March 20, 2001, he had married a U.S. citizen. Lombardi allegedly replied, "Oh my God! If you were here before April 30, 2001, you would be talking now with me with your green card in your pocket."

Lombardi then explained to Piranej that the law had extended the INA section 245(i) waiver to allow adjustment of status for those aliens physically present in the United States who

---

[4] Immigration and National Act (INA) section 245(i), 8 U.S.C. § 1255(i), had offered a route to legalization for certain aliens, physically present in the United States, who had had petitions for immigrant visas submitted on their behalf by January 14, 1998. The waiver available for aliens who had been lawfully admitted to the United States, 8 U.S.C. § 1255(e)(3), was of no relevance to Piranej, since he had entered on a false passport.

were the beneficiaries of visa petitions filed by April 30, 2001.[5] Lombardi advised Piranej to have Neza file, as soon as possible, an I-130 petition for permanent residence of an alien spouse. Lombardi assisted with this filing, which was submitted on August 9, 2002, almost sixteen months after the statutory deadline. In January 2003, the Piranejs had a son, Brian, and on April 14, 2003, roughly two months after Piranej's removability had been upheld by the BIA, the INS approved Neza's I-130 petition.

B. *The BIA's Decision*

The BIA, with one Board Member dissenting, denied Piranej's motion to reopen on December 17, 2003. *In re Piranej*, No. A76 085 301 (B.I.A. Dec. 17, 2003). It first noted that the I-130 petition, filed by Neza on Piranej's behalf, was not filed until August 9, 2002, and that neither the statute, INA section 245(i), 8 U.S.C. § 1255(i), nor its implementing regulation, 8 C.F.R. § 1245.10, provided for an exception to the April 30, 2001 filing deadline. On that basis, the BIA denied Piranej's petition to reopen; since Piranej was not the beneficiary of a timely filed petition for an immigrant visa, he was "statutorily ineligible" for adjustment of status under section 245(i), hence reopening was not warranted.

The BIA did not address, however, whether the statute allowed for any equitable measures to toll the deadline. Instead, it stated that "[e]ven if section 245(i) of the Act was interpreted to include ineffective assistance of counsel as an exception to the April 30, 2001 filing deadline," Piranej had not met the requirements under *Lozada*. The Board reasoned that

---

[5] The LIFE Act was enacted on December 21, 2000. Pub. L. No. 106-554, 114 Stat. 2763 (codified as amended at 8 U.S.C. §1255 (2000)). It extended the grandfathering provision of section 245(i), offering adjustment of status to anyone present in the United States, legally or illegally, who had a petition for an immigrant visa submitted on his or her behalf by April 30, 2001.

Piranej's required affidavit "fail[ed] to set forth in detail the agreement that was entered into with counsel with respect to the actions to be taken and what representation counsel did or did not make to the respondent. The affidavit merely recount[ed] what his counsel failed to do, but [did] not mention what actions his counsel promised to undertake."

The dissenting Board Member, Lauri Steven Filppu, disagreed with this analysis. She instead determined (a) that Piranej had, in fact, complied with the *Lozada* requirements, and (b) that, in light of this Court's decision in *Rabiu v. INS*, 41 F.3d 879 (2d Cir. 1994), "attorney error should permit [Piranej] to obtain the benefits of section 245(i) . . . , even though the necessary filings are untimely under that statute." The dissent would have remanded the case to the IJ to resolve factual disputes regarding whether attorney negligence had actually occurred and, if Piranej prevailed on the facts, would have ordered the IJ to reopen proceedings.

Piranej timely filed a petition for review before this Court. He contends that, in the circumstances of his case, the BIA abused its discretion in its application of the *Lozada* requirements.

DISCUSSION

We review the BIA's denial of a motion to reopen for abuse of discretion. *Kaur v. BIA*, 413 F.3d 232, 233 (2d Cir. 2005) (per curiam). "An abuse of discretion may be found in those circumstances where the Board's decision provides no rational explanation, inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements; that is to say, where the Board has acted in an arbitrary or capricious manner." *Zhao v. U.S. Dep't of Justice*, 265 F.3d 83, 93 (2d Cir. 2001) (internal citations omitted).

7

**I. The *Lozada* Requirements**

The BIA, in its decision in *In re Lozada*, outlined certain requirements for making an ineffective assistance of counsel claim:

> A motion based upon a claim of ineffective assistance of counsel should be supported by an affidavit of the allegedly aggrieved respondent attesting to the relevant facts. *In the case before us, that affidavit should include a statement that sets forth in detail the agreement that was entered into with former counsel with respect to the actions to be taken on appeal and what counsel did or did not represent to the respondent in this regard.* Furthermore, before allegations of ineffective assistance of former counsel are presented to the Board, former counsel must be informed of the allegations and allowed the opportunity to respond. Any subsequent response from counsel, or report of counsel's failure or refusal to respond, should be submitted with the motion. Finally, if it is asserted that prior counsel's handling of the case involved a violation of ethical or legal responsibilities, the motion should reflect whether a complaint has been filed with appropriate disciplinary authorities regarding such representation, and if not, why not.

*Lozada*, 19 I. & N. Dec. at 639 (emphasis added).

As the BIA has itself noted, the primary rationale for the imposition of these requirements is to provide a basis for determining whether the assistance provided by counsel was, in fact, ineffective. *Lozada*, 19 I. & N. Dec. at 639 ("[This] high standard . . . is necessary . . . to have a basis for assessing the substantial number of claims of ineffective assistance of counsel that come before the Board. Where essential information is lacking, it is impossible to evaluate the substance of such claim."). A secondary purpose, as we have acknowledged, is to "deter meritless claims." *Twum v. INS*, 411 F.3d 54, 59 (2d Cir. 2005). For both reasons, this Court has firmly upheld the relevance of the *Lozada* requirements. *See Zheng v. U.S. Dep't of Justice*, 409 F.3d 43, 47 (2d Cir. 2005). Accordingly, "[w]e have upheld the application of these requirements . . . where appropriate." *Twum*, 411 F.3d at 59. In its role as gatekeeper, however, this Court has "not required a slavish adherence to the [*Lozada*] requirements." *Yi Long Yang v. Gonzales*, 478 F.3d 133, 142-43

8

(2d Cir. 2007). Rather than over-deterrence, our aim has been balance. We have recognized that requiring strict compliance increases the danger of foreclosing those claims that are colorable and may be meritorious. *See id*.

In the case before us, it is undisputed that Piranej satisfied all but one of the *Lozada* requirements.[6] He informed his former counsel, Lombardi, of the allegations against him. Lombardi was given an opportunity, which he took, to respond to the allegations. And Piranej filed a complaint with the Departmental Disciplinary Committee.[7] It is the first *Lozada* requirement – that petitioner present an affidavit "set[ting] forth in detail the agreement . . . with former counsel," *Lozada*, 19 I. & N. Dec. at 639 – that is at issue in this appeal.

**II. The Alleged Relationship and the Scope of an "Agreement" Under *Lozada***

*A. The Alleged Relationship*

Piranej's affidavit outlines his ongoing relationship with his counsel. In mid-October 1998, Piranej met Lombardi at his law office in Astoria, New York. Lombardi had been recommended to Piranej by James Hakanjan, the man who had assisted Piranej with his original, flawed, asylum application.[8] Lombardi described Hakanjan as a "prominent member of the

---

[6] To make an ineffective assistance of counsel claim, in addition to the *Lozada* requirements, a petitioner must also show that he was prejudiced by counsel's action, or inaction. *Yi Long Yang v. Gonzales*, 478 F.3d 133, 142 (2d Cir. 2007). The BIA did not address prejudice in its decision in the case before us. We note, however, that should Piranej be able to demonstrate the ineffectiveness of his counsel, it is likely that Piranej would be able to show prejudice, given his marriage to a U.S. citizen in March 2001, and the probability that his wife would have filed an immigrant petition on his behalf before April 30, 2001, had she been aware of the possibility of doing so.

[7] The fact that the Disciplinary Committee closed its investigation of Lombardi, noted by the BIA in its decision, does not serve to undermine Piranej's compliance with this *Lozada* factor.

[8] The Piranejs refer to a "James Hakaj" in various documents. Lombardi refers to "James Hakanjan." It is evident from the Piranejs' July 16, 2003 letter to the Departmental Disciplinary

9

Albanian community," who would, "from time to time," ask Lombardi to "see people and try to help them." At their October 1998 meeting, Lombardi allegedly informed Piranej that "he would charge [] $1,200 to represent him in his removal proceedings," and that Piranej should "bring $500 on the hearing date and the balance of the $1,200 would be payable on demand . . . from time to time throughout the proceedings." No written agreement was entered into.

After a master hearing in late October, Piranej paid Lombardi $500 in cash. Piranej did not receive a receipt. At the October hearing, the case was adjourned until December 3, at which time Piranej conceded his removability and sought political asylum and withholding of removal as relief. Piranej's next hearing was scheduled for March 9, 1999. Piranej alleges that he made numerous calls to Lombardi's office in an attempt to prepare for that hearing, but that his messages were not returned. On the evening of March 8, Piranej met with Lombardi at a restaurant to discuss the case, and Lombardi "assured him not to worry and [that] he would take care of it." At the hearing on March 9, the IJ denied Piranej's petitions for relief. According to Piranej, "[a]s soon as [he and his fiancée] left the courtroom, Mr. Lombardi informed [them] that for him to do the appeal he wanted $300 as soon as possible so that he could enter his appearance as [Piranej's] legal counsel before the deadline." A few days later, Piranej went to Lombardi's new office, now in Manhattan, to pay the money. It was at this meeting that Lombardi allegedly advised the couple not to get married, due to the fact that Piranej would have to leave the country prior to adjusting his status.

As of April 7, 1999, Piranej had an appeal pending before the BIA and, apparently, a $400 balance outstanding to Lombardi. After his wedding, Piranej went to Lombardi's office,

Committee, in which they refer to "James Hakanjan," that the two parties are referring to the same person.

10

allegedly to "take [his] files to another attorney," and told Lombardi about his marriage.[9] Piranej states that subsequently, in August 2002, Lombardi helped Neza, Piranej's U.S. citizen wife, fill out and file an I-130 application, without any further fee.

In arguing that, given Lombardi's alleged earlier advice on the subject of marriage and its immigration consequences, Lombardi should have advised him of the change in section 245(i) filing deadlines, Piranej alleges facts indicating that the nature of his relationship with Lombardi was that of a retainer agreement, under which Lombardi was to provide general legal assistance to Piranej in Piranej's efforts to avoid removal. And, in this respect, Lombardi's assistance to Piranej's wife in filing the I-130 application, without further fee, supports such a view of their relationship.

Yet the exact parameters of this attorney-client relationship are unclear. Lombardi admits that in 1999, he explained to Piranej and his then-fiancée Neza that the law required an alien to leave the United States in order to adjust his status following a marriage to a U.S. citizen. But he states that his agreement with Piranej was only to represent Piranej in his immigration *proceedings*. And notwithstanding his comments that he provided other clients with this information,[10] Lombardi denies that he had any affirmative obligation to inform Piranej of

---

[9] Piranej states that this meeting took place in July 2002. In his response to the allegations, Lombardi consistently refers to the meeting as taking place in July 2001, a date potentially more favorable to Piranej since it was only two or so months after the April 30, 2001 filing deadline.

[10] Lombardi stated that:

Mr. and Mrs. Piranej claim . . . to have attempted to contact me after they did get married . . . . While they may have called the office, they did not provide us with any information regarding their marital status. . . .

The office was in a frenzy of activity. If I had been aware that Mr. and Mrs. Piranej were married, I would have advised my client Mr. Piranej to have a petition filed on his behalf so that he could benefit from the change in the law.

11

the change in the filing deadlines for section 245(i). He describes his subsequent work on the I-130 filing as "a favor to [his] client, Artur Piranej."

Like the dissenting BIA member, we believe that the exact nature of the Piranej/Lombardi relationship can only be determined after additional fact-finding. Hence, if that relationship could, on a plausible reading of the facts, satisfy *Lozada*, a remand for fact-finding would be necessary. It is this *Lozada* question to which we therefore turn.

### B. The Scope of Lozada*'s Agreement*

To examine this question properly, we must begin by looking at *Lozada* itself, and at the possible type of agreement involved in that case. In doing so, we note that the BIA in *Lozada* prescribed the content of the aggrieved alien's affidavit in light of the "case before us," 19 I. & N. Dec. at 639 ("A motion based upon a claim of ineffective assistance of counsel should be supported by an affidavit . . . . *In the case before us*, that affidavit should include a statement that sets forth in detail the agreement that was entered into with former counsel . . . ." (emphasis added)), and therefore may have tailored the requirement to comport with the particular facts of *Lozada*. What were these facts?

In *Lozada*, the allegation made by petitioner was that, after filing a Notice to Appeal the decision of the IJ, his counsel had failed to submit a brief in the petitioner's appeal to the BIA. *Id.* at 638. Not surprisingly, the BIA required an affidavit from Lozada setting forth in detail the agreement between Lozada and his former counsel and alleging, with specificity, the "actions to

---

At that time I had over five hundred active cases. When the law was changed, I attempted to review files and to inform all married clients who would benefit that the law had been changed.

12

be taken on appeal and what counsel did or did not represent to the respondent in this regard." *Id.* at 639. Given the nature of Lozada's grievance against his attorney, that information was essential to determine whether Lozada's lawyer had acted properly. *See id.* ("Where essential information is lacking, it is impossible to evaluate the substance of . . . [an ineffective assistance] claim. In the instant case, for example, the respondent has not alleged, let alone established, that former counsel ever agreed to prepare a brief on appeal or was engaged to undertake the task.").

In the case before us, the BIA, using the *Lozada* rubric, faulted Piranej for failing to set forth in detail the agreement entered into "with respect to the actions to be taken and what representation counsel did or did not make to the respondent." It continued, noting that "[t]he affidavit merely recounts what his counsel failed to do, but does not mention what actions his counsel promised to undertake." In doing so, the BIA applied mechanically to Piranej's case a framework that was derived from the particular attorney-client relationship claimed in *Lozada*, a very different case. And it did so, despite the fact that *Lozada* itself expressly noted that the requirement applied "in the case before us" (and presumably in those with similar attorney/client arrangements). In other words, the BIA failed to consider the possibility of a general retainer agreement and whether, given the nature of that type of agreement, Piranej's allegations, as they stood, substantially complied with the aims of *Lozada*. As the dissenting Board Member noted, it was precisely because Lombardi failed to inform Piranej of the need to "take action" that there was no more specific agreement to take action with respect to the section 245(i) waiver. Assuming the existence of a retainer relationship, and that such a relationship can give rise to an ineffectiveness claim, it is hard to see what more Piranej could have asserted.

*C. Additional Considerations*

13

If the IJ finds that a general retainer agreement did exist between Piranej and Lombardi, it will be for the BIA in the first instance to determine (a) whether the existence of a general retainer agreement can give rise to ineffective assistance of counsel claims in the immigration/removal context; (b) assuming such claims can be made, what the equivalent of the *Lozada* agreement requirement should be in such situations; and (c) whether the allegations made by Piranej as to Lombardi's failures to act are sufficient to comply substantially with such a functional *Lozada* framework.

### III. Equitable Tolling, *Nunc Pro Tunc*, and Section 245(I)

Until the question of Piranej's compliance with *Lozada* is resolved, and Lombardi's assistance determined to have been ineffective,[11] any discussion of whether ineffective assistance of counsel could serve, either through equitable tolling or nunc pro tunc relief, as an exception to the April 30, 2001 section 245(i) filing deadline is premature. This Court has not considered whether section 245(i) admits of these equitable remedies. And, the questions should, in any event, be addressed by the BIA in the first instance. *See, e.g.*, *INS v. Ventura*, 537 U.S. 12, 16 (2002). Since the BIA majority expressly declined to speak to these issues when considering Piranej's motion to reopen, the less said about them by us at this time, the better.

---

[11] Such a finding depends in part on a question separate from those discussed earlier in the text: Did Lombardi's failure to inform Piranej of the change in the section 245(i) filing deadlines constitute inadequate assistance of counsel for deportation proceeding purposes? *See, e.g.*, *Rabiu v. INS*, 41 F.3d 879, 882 (2d Cir. 1994) (stating that to demonstrate a Fifth Amendment due process violation, a petitioner must "show that his counsel's performance was so ineffective as to have impinged upon the fundamental fairness of the hearing" (internal quotation marks and citation omitted)).

## CONCLUSION

For the foregoing reasons, we GRANT the petition for review, VACATE the BIA's order, and REMAND the case to the BIA for further proceedings consistent with this opinion.