**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-2302

QING HUA LIN,

Petitioner,

v.

ERIC H. HOLDER, JR., Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued:  September 18, 2013        Decided:  November 22, 2013

Before GREGORY and THACKER, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Petition denied by published opinion.  Judge Gregory wrote the opinion, in which Judge Thacker and Senior Judge Hamilton joined.  Judge Thacker wrote a separate concurring opinion.

**ARGUED**: Joshua E. Bardavid, BARDAVID LAW, New York, New York, for Petitioner.  Jonathan Aaron Robbins, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF**:  Stuart F. Delery, Principal Deputy Assistant Attorney General, Ernesto H. Molina, Jr., Assistant Director, S. Nicole Nardone, Civil Division, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

GREGORY, Circuit Judge:

Qing Hua Lin petitions this Court for review of an order of the Board of Immigration Appeals ("Board") dismissing her appeal from the Immigration Judge's ("IJ") order finding that she was not eligible for asylum, withholding of removal, or deferral of removal under the Convention Against Torture ("CAT"). For the reasons stated below, we deny Lin's petition for review.

I.

A.

Lin is a native citizen of the People's Republic of China ("China"). She illegally entered the United States near Hidalgo, Texas on August 19, 2009. On October 6, 2009, the Department of Homeland Security commenced removal proceedings against Lin by issuing a notice to appear, charging her with removability under § 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(7)(A)(i)(I), as an alien who, at the time of application for admission to the United States, was not in possession of valid entry documents. Lin then sought relief from removal in the form of asylum, withholding of removal, and protection under the CAT. JA 535. Following several hearings, the IJ issued an order and written opinion denying Lin's application and ordering her removed to

2

China.  JA 50-65.  Lin appealed to the Board, which affirmed the decision of the IJ.  Lin then timely appealed to this Court.

The disposition of this case turns primarily on discrepancies between Petitioner's statements at different stages of the asylum process.  Accordingly, we detail below the relevant testimony and materials from Lin's interviews, hearings, and written application for asylum.

### Border Patrol Interview, August 20, 2009

Lin was interviewed by a Border Patrol Agent immediately upon being apprehended entering the country (the "Border Patrol interview" or "interview").  During the interview, Lin stated that she was not married and that she had one child.  JA 233.  When asked what her purpose was for entering the United States, she responded "[t]o avoid population control regulations in China."  JA 229.  When asked whether she feared persecution if sent back to China, she indicated that she planned to have more children, and that she would be forced to have an abortion or undergo a tubal ligation if she became pregnant again.  JA 235.  She also stated that she feared she would be unable to get married if she was sterilized.  Id.  Finally, Lin explained that because she had given birth out of wedlock, which is seen as "anti-cultural" in China, she instructed her son to refer to her as "Auntie."  Id.

**Credible Fear Hearing, September 18, 2009**

By this time Lin had retained an attorney. JA 572. During the hearing, and in contrast to the Border Patrol interview, Lin stated that she was married to a man named Dehua Jiang, who continued to reside in China with their son. JA 573. Notably, she also stated that she left China because she had been forced to undergo an unwanted abortion on January 24, 2008. JA 574. This fact was not mentioned during Lin's Border Patrol interview. Following the abortion, her husband went into hiding for fear that he would be sterilized and he encouraged Lin to seek refuge in the United States. JA 575.

**Asylum Application and Supporting Documents**

On April 28, 2010, Lin submitted an application for asylum and a written statement. The statement provided that Lin married Jiang on September 8, 2004. JA 246. In 2005, four months after the birth of her son, family planning officials from the Chinese government forced Lin to have an IUD implanted and submit to regular gynecological checkups. Id. The statement also discussed the 2008 forced abortion. Id.

In support of her asylum application, Lin also submitted several documents: an abortion certificate from the First Hospital of Fuzhou, a notice from Yang Zhong Village committee requesting that Lin appear for an IUD and pregnancy checkup, and a notice from Yang Zhong Village Committee notifying Lin that

4

she had violated the family planning regulations and fining her 10,000 yuan. JA 273-80. Lin also submitted a statement from her mother-in-law, providing that Lin and her son were married in 2004. JA 285. Her mother-in-law described Lin's forced abortion and how family planning officials continue to visit her house on a regular basis looking for Lin and her husband. JA 285. Finally, Lin submitted a statement from her husband. He provided that the two were married in September 2004 and that the marriage was "permitted and blessed." JA 294. He also recounted the circumstances of Lin's forced abortion and the couple's decision that she seek refuge in the United States. JA 294-95.

### State Department Report on China

The government submitted a 2007 report from the United States Department of State on China's population control policies. JA 26-27. The report stated that the policies were no longer strictly enforced and that there have been few reports of forced abortions or sterilizations in Fujian Province over the last twenty years. Id.

### First Merits Hearing, August 31, 2010

Lin gave the following testimony in support of her asylum claim before an IJ on August 31, 2010:

Lin married Jiang on September 8, 2004. JA 101. Their only child, a son, was born on March 23, 2005. JA 102. Four months

5

after his birth, family planning officials came to her home and took her to a birth control office to insert an IUD.  JA 103-04. Lin was instructed that she would have to attend seasonal check-ups to ensure the IUD remained inserted and that she had not become pregnant again.  JA 103.

On January 24, 2008, after learning that Lin was pregnant again,[1] five family planning officials came to Lin's rented house in Fuzhou City, forced her into a van, and performed an unwanted abortion on her at a local hospital.  JA 109-12.  After the procedure, she was told that she would have to pay a 10,000 yuan fine, and that if she did not her husband would be arrested and forcibly sterilized.  JA 112.

When asked by the IJ whether she was given any documentation regarding the abortion, Lin stated that originally she was not, but a few days after the procedure she returned to the hospital and requested an abortion certificate.  JA 113.  When asked why she requested the document, she first stated that she wanted to have "proof for the future," and because she "assumed that America has . . . human rights, and I think that certificate will be useful in the future."  JA 114.  The IJ then asked her whether she was already planning to come to America, and she

---

[1] Lin and her husband hired a private doctor to secretly remove her IUD to allow her to become pregnant again.  JA 294.

stated "not yet . . . I just assumed that this certificate would be useful to me in the future." JA 115. Under further questioning, Lin then changed her answer, stating that she requested the document so she could take a vacation from work. Id. When the IJ noted that Lin was self-employed, she changed her answer once again, stating that she was in fact planning on applying for asylum in the United States at the time she requested the documentation and thought it would be helpful for that purpose. JA 116-117.

### Status Conference and Submission of Additional Government Evidence, November 16, 2010

The IJ held a status conference in the matter on November 16, 2010. At the hearing, the government requested that the court consider additional evidence that was part of Lin's file but had not been discovered by the government's attorneys until after the close of evidence. JA 175. The additional evidence consisted of the recorded notes from Lin's September 20, 2009 Border Patrol interview. Id. Over Petitioner's objection, the IJ decided to accept the evidence and hold a second evidentiary hearing so the parties would have an opportunity to address the new evidence. Id.

### Second Merits Hearing, January 31, 2011

At the second hearing, Lin was asked why she told the Border Patrol Agent during the interview that she was not

7

married. Lin responded, "[i]n our village, our practice is, if you did not have the, you know, banquet, if you did not have the Chinese ceremony, you really [are not] consider[ed] married." Id. When asked why she responded differently at the credible fear hearing, she said that her attorney had told her in the interim that "in the United States if you are registered at the court . . . you are considered as married." JA 181. In essence, Lin blamed the contradictory testimony on a cultural misunderstanding. Lin conceded, however, that she registered her marriage with the Chinese government in 2004. JA 186.

Lin was also questioned why she did not mention the forced abortion during the Border Patrol interview. In vague and non-responsive answers, she indicated that the Agent conducting the interview told her not to provide details of her claim and that she could tell her full story to a judge later. JA 193-95. She also stated that she did not think there was room on the Agent's form to record detailed answers. JA 193.

B.

On March 1, 2011, the IJ issued a decision denying Lin's applications for asylum, withholding of removal, and protection under the CAT, and ordered her removed to China. JA 50-65. The IJ found Lin not credible "in light of the inconsistencies, implausibilities, and contradictions" in her testimony, her application, and her statements during the Border Patrol

8

interview. JA 61. The IJ also found that Lin's attempts to explain the inconsistencies and omissions were "vague[], non-responsive[][,] and did not provide credible explanations." Id.

Specifically, the IJ noted that Lin told the Border Patrol Agent that she was not married and:

> [S]he was afraid that she would be forced to have an abortion or tubule [sic] ligation and that if she were forced to have a tubule [sic] ligation, she was afraid that she would never be able to get married. Despite discussing her fear of a future forced abortion, [Lin] did not tell the border patrol officer that she had previously had a forced abortion. In marked contrast, [Lin] testified in Court that she was already married and had been forced to have an abortion.

JA 61. The IJ found Lin's explanations for the inconsistencies "wholly inadequate and incredible." Id. The IJ noted that Lin's "cultural misunderstanding" explanation regarding her marital status was undermined by the fact that during her first hearing she repeatedly testified that she was married, and only after she was confronted with her inconsistent testimony did she "manufacture[] her explanation." JA 62. The IJ also found that Lin's husband's affidavit referring to their marriage as "permitted and blessed" undercut Lin's claim of a misunderstanding.

Of even greater significance to the IJ, however, was Lin's failure to mention her forced abortion during her Border Patrol interview. Id. The IJ explained:

9

Lin attempted to blame the omission on the border patrol officer rushing her. [Lin] was repeatedly evasive and unresponsive when asked directly whether she told the border patrol officer that she had a forced abortion. Only after being asked repeatedly did [Lin] admit that she did not tell the border patrol officer about her alleged forced abortion. [Lin] attempted to explain that she wanted to tell the officer about the abortion, but he told her that there was no space for details and to tell the judge. The Court finds this explanation entirely incredible. The alleged forced abortion is not a detail, but rather is the crux of [Lin's] entire asylum claim. . . . It is wholly implausible, therefore, that [Lin] would not have mentioned an experience as pivotal and traumatic as a forced abortion, when she had sufficient opportunity to describe other details about her alleged fear of returning to China.

Id.

The IJ also noted that he had reservations about Lin's credibility even before the omission regarding the forced abortion came to light. Id. Specifically, the IJ found implausible Lin's explanations for why she obtained the abortion certificate. JA 63. The IJ noted that Lin changed her testimony on this issue several times, first stating that she requested the certificate because she knew the United States protected human rights, then stating she needed it in order to take a vacation, and then finally reverting back to her original position. Id.[2]

---

[2] The IJ also mentioned two additional areas of concern with Lin's testimony. First, the IJ thought Lin's statements regarding where she and her husband lived to be confused and inconsistent. Id. According to the IJ, Lin first testified (Continued)

10

Given these inconsistencies, the IJ determined that Lin's testimony was not credible. JA 64. Noting that an adverse credibility determination can be overcome if the alien can independently prove past persecution, the IJ determined that Lin had not provided sufficient evidence to prove she was the victim of a forced abortion. Id. The IJ discredited the abortion certificate as unauthenticated and suspect in light of Lin's testimony, and noted the State Department's report that population controls are no longer strictly enforced in China. Id. Accordingly, the IJ denied all of Lin's claims.

The Board agreed with the IJ's decision in all pertinent parts and adopted its decision denying Lin's claims. JA 3-4. It held that the IJ provided "specific and cogent reasons" for

---

that they moved to Fuzhou City and rented a room there in July 2007 in order to secretly remove her IUD and have another child. Id. On her asylum application, however, she listed her address as Fuzhou City beginning in 2004. Id. Lin testified to the court that up until 2007 she actually lived with her parents in Ming Ho County, and her husband would sometimes visit her there. Id. The IJ stated that he found Lin's testimony about her residence "to be difficult to follow and generally inconsistent. Although not a significant inconsistency in [her] testimony, her changing account of where she and her husband lived further undermines her general credibility." Id.

Secondly, the IJ thought it noteworthy that Lin did not provide a letter from her parents to corroborate her testimony that family planning authorities visited their home every few days looking for her. Id. The IJ found the lack of corroboration unreasonable given Lin's testimony that she remains in regular contact with her parents. Id.

11

the adverse credibility determination, repeating the IJ's concerns with Lin's testimony. JA 3. The Board also agreed that Lin failed to provide independent evidence proving that she suffered past persecution. JA 4. Additionally, the Board rejected Lin's argument that the IJ's decision allowing the government to submit additional evidence violated her due process rights. Id. The Board noted that IJs have the authority to set and extend deadlines and that Lin was given an opportunity to respond to the new evidence. Id.

## II.

### A.

Where the Board affirms and adopts the IJ's decision, we review both decisions as the final agency action. Marynenka v. Holder, 592 F.3d 594, 600 (4th Cir. 2010). We are obliged to uphold the agency's determination unless it is "manifestly contrary to the law and an abuse of discretion." Lizama v. Holder, 629 F.3d 440, 444 (4th Cir. 2011). The agency abuses its discretion "if it fail[s] to offer a reasoned explanation for its decision, or if it distort[s] or disregard[s] important aspects of the applicant's claim." Tassi v. Holder, 660 F.3d 710, 719 (4th Cir. 2011). Factual determinations are reviewed only to ensure they are supported by substantial evidence. Marynenka, 592 F.3d at 600. Substantial evidence exists to

12

support a finding "unless the evidence . . . was such that any reasonable adjudicator would have been compelled to conclude to the contrary." Id. Review of the agency's overall conclusion that an applicant is ineligible for asylum is similarly limited to whether the applicant's evidence "was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). This standard is very deferential, and does not permit a re-weighing of the evidence. See Niang v. Gonzales, 492 F.3d 505, 511 (4th Cir. 2007) ("[If] the record plausibly could support two results: the one the IJ chose and the one [the petitioner] advances, reversal is only appropriate where the court find[s] that the evidence not only supports [the opposite] conclusion, but compels it.") (quoting Balogun v. Ashcroft, 374 F.3d 492, 507 (7th Cir. 2004)) (internal quotation marks omitted).

B.

The INA vests in the Attorney General the discretionary power "to grant asylum to aliens who qualify as 'refugees.'" Dankam v. Gonzales, 495 F.3d 113, 115 (4th Cir. 2007). A refugee is "someone 'who is unable or unwilling to return to' his native country 'because of persecution or a well-founded fear of persecution on account of . . . political opinion' or other protected grounds." Id. (quoting 8 U.S.C.

13

§ 1101(a)(42)(A)). Asylum applicants may satisfy their burden of proving that they meet the definition of a refugee by "showing either that [they were] subjected to past persecution or that [they have] a 'well-founded' fear of future persecution 'on account of race, religion, nationality, membership in a particular social group, or political opinion.'" Marynenka, 592 F.3d at 600 (quoting 8 C.F.R. § 208.13(b)(1)). A person who was "forced to undergo" an abortion or sterilization "shall be deemed to have a well-founded fear of persecution on account of political opinion." 8 U.S.C. § 1101(a)(42).

Aliens face a heightened burden of proof to qualify for withholding of removal. Dankam, 495 F.3d at 115. The alien must establish a "clear probability" that she would suffer persecution if repatriated. Id. If an alien meets this heightened burden, withholding of removal is mandatory. Id. Lin also seeks protection from removal under the CAT, which requires aliens to demonstrate "that it is more likely than not that [they] would be tortured if removed to the proposed country of removal," regardless of the grounds for the torture. Id.

III.

A.

Lin first contends that substantial evidence does not support the agency's adverse credibility determination.

14

Applicants can establish their eligibility for asylum simply by providing credible testimony about their experiences. Marynenka, 592 F.3d at 601 (citing 8 C.F.R. § 208.13(a)). Review of an adverse credibility determination is limited to ensuring that substantial evidence exists to support it. Dankam, 495 F.3d at 119. "We accord broad deference to the agency's credibility determination. This deference, however, is not absolute, for the agency must provide specific, cogent reasons for making an adverse credibility determination." Djadjou v. Holder, 662 F.3d 265, 273 (4th Cir. 2011). "We have recognized that omissions, inconsistencies, contradictory evidence and inherently improbable testimony are appropriate bases for making an adverse credibility determination." Id. Even the existence of only a few such inconsistencies can support an adverse credibility determination. Id. Following passage of the REAL ID Act of 2005, an inconsistency can serve as a basis for an adverse credibility determination "without regard to whether [it] goes to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii).

As recounted above, the agency gave multiple reasons for the adverse credibility determination. Chief among them, however, were the inconsistencies between Lin's statements during the Border Patrol interview and her later testimony and application materials. Lin gave shifting, contradictory

15

accounts of her marital status and omitted any mention of her forced abortion. After reviewing the record, we agree with the agency that these omissions and inconsistencies provide sufficient justification for the adverse credibility determination.

The foundation of Lin's claim is that she was subjected to a forced abortion; however, when interviewed upon entering the country, she failed to mention the incident at all. We are highly skeptical of such an important omission. As the agency noted, the forced abortion is not a detail, but rather is the very heart of Lin's claim for asylum. The traumatic details of the incident as later described by Lin, including being forced into a van and whisked away to the hospital, make it wholly implausible that she would fail to even mention the incident during the interview. See Xiao v. Mukasey, 547 F.3d 712, 717 (7th Cir. 2008) (holding a petitioner's failure to mention a past forced abortion during an airport interview sufficient to warrant an adverse credibility determination). The omission is particularly suspect in light of the fact that Lin specifically referenced a fear that she would have to undergo future forced abortions if she was returned to China, but failed to mention the fact that she previously had been subjected to the very same experience.

16

Lin's explanation for the omission -- that the Border Patrol Agent told her he could not record the details of her claim -- is undermined by the fact that Lin was able to mention several other details of her past, such as the fact that she was unmarried, had a child out of wedlock, and instructed her son to refer to her as "Auntie." Perhaps most importantly, Lin acknowledged that she obtained the abortion certificate with an eye toward using it to help her gain asylum in the United States. This indicates that she was already aware of the significance of the incident with regard to a future asylum claim, making her omission all the more suspect.

We also agree with the IJ's decision discounting Lin's explanation that a cultural misunderstanding accounted for her inconsistent testimony regarding her marital status. Her explanation is undermined by the fact that she repeatedly and unqualifiedly referred to herself as married throughout the asylum process, only to change course when confronted with her earlier, inconsistent testimony. Further undercutting her claim are her husband's affidavit attesting that the couple's marriage was "permitted and blessed," and the statement from her mother-in-law referring to the couple as married. Taken together, these facts give ample support for the IJ's determination that Lin's testimony was not credible.

In concluding that, under the facts and circumstances of this case, Lin's inconsistencies and omissions between her Border Patrol interview and her later testimony are sufficient to support the agency's adverse credibility determination, we note our hesitation in relying so extensively on statements made in such a setting. Most so-called "airport interviews" are brief affairs given in the hours immediately following long and often dangerous journeys into the United States. These circumstances caution against basing an adverse credibility determination solely on inconsistencies and, especially, omissions that arise out of statements made in such environments. As evidenced by the questions asked of Lin, the purpose of these interviews is to collect general identification and background information about the alien. JA 229-30. The interviews are not part of the formal asylum process, and are conducted without legal representation and before most aliens are aware of the elements necessary to support a claim for asylum. Requiring precise evidentiary detail in such circumstances ignores the reality of the interview process and places an unduly onerous burden on an alien who later seeks asylum.

It is for these reasons a significant number of our sister circuits have limited the extent to which credibility determinations may be based on airport interviews. See, e.g.,

18

*Moab v. Gonzales*, 500 F.3d 656, 660-61 (7th Cir. 2007) ("[A]irport interviews . . . are not always reliable indicators of credibility. . . . [I]nterviews in which the questions asked are not designed to elicit the details of an asylum claim, or the INS officer fails to ask follow-up questions that would aid the alien in developing his or her account [are less reliable]."); *Ramsameachire v. Ashcroft*, 357 F.3d 169, 179 (2nd Cir. 2004) (Sotomayor, J.) ("The airport interview is an inherently limited forum for the alien to express the fear that will provide the basis for his or her asylum claim, and the BIA must be cognizant of the interview's limitations when using its substance against an asylum applicant."); see also *Joseph v. Holder*, 600 F.3d 1235, 1243 (9th Cir. 2010) (citing *Singh v. INS*, 292, F.3d 1017, 1021 (9th Cir. 2002)); *Tang v. Attorney General*, 578 F.3d 1270, 1279 (11th Cir. 2009); *Zubeda v. Ashcroft*, 333 F.3d 463, 477 (3rd Cir. 2003). We hereby note our general agreement with the concerns expressed by these and other circuits over the agency's unqualified reliance on statements made in airport interviews.

With these considerations in mind, we repeat why they fail to rescue Lin's claim for asylum. Lin's allegation of a forced abortion is not a minor evidentiary detail whose absence can be overlooked, it is the very core of her claim. Moreover, her acknowledgment that she requested documentation of the procedure

19

for the express purpose of supporting a future asylum claim indicates that she understood the importance of the incident. We therefore simply cannot countenance her complete failure to mention it during her interview. We also note that Lin's testimony regarding her marital status was not a mere omission, but a direct contradiction for which she later was unable to provide a believable explanation.

We also agree with the agency's assessment that Lin's demeanor and non-responsiveness during questioning on certain topics support the adverse credibility determination. For example, Lin's testimony as to why she requested the abortion certificate was initially hesitant and confused. As explained above, she changed course several times before finally admitting that she thought the certificate would be helpful in supporting a future asylum claim. JA 115. Similarly, Lin gave a series of non-responsive answers to direct questions from the IJ asking whether she told the Border Patrol Agent about the forced abortion. JA 192-95. Only under repeated questioning did she acknowledge that she did not mention the procedure. Id. Lin's dubious testimony in these areas is especially significant given that they relate directly to the forced abortion, a topic about which there is already considerable question.

In sum, far from compelling a contrary result, the evidence in this case reliably supports the agency's adverse credibility

20

determination.  See Niang, 492 F.3d at 511.  The IJ provided specific and cogent reasons for the decision, and we will not disturb the result in the absence of convincing evidence to the contrary.[3]

B.

Although adverse credibility determinations are generally fatal to an asylum claim, an applicant may still prevail if she can prove actual past persecution through independent evidence. Camara v. Ashcroft, 378 F.3d 361, 369 (4th Cir. 2004).  We conclude that the agency properly reviewed the record and determined that Lin failed to provide independent evidence demonstrating past persecution.

As discussed above, the abortion certificate provided by Lin is suspect in light of her unreliable testimony.  In addition, her evidence of a fine for a "violation of family planning regulations," which by itself is hardly demonstrable proof that she suffered a forced abortion, is countered by reliable evidence from the Department of State that family

---

[3] However, we note our disagreement with the agency's determination that Lin's testimony about her place of residence in China was inconsistent or misleading.  Likewise, we find no support for the agency's reliance on Lin's failure to provide a letter from her parents attesting that Chinese officials continue to visit their home in search of Lin and her husband when she provided a letter from her mother-in-law attesting to precisely the same facts.  In light of the larger issues with Lin's claim, however, these errors of the agency were harmless.

21

planning regulations are no longer strictly enforced in the area. See Suarez-Valenzuela v. Holder, 714 F.3d 241, 248 (4th Cir. 2013) (noting that State Department reports are "highly probative evidence" of conditions in foreign countries) (quoting Gonahasa v. INS, 181 F.3d 538, 542 (4th Cir. 1999)). The agency also considered the affidavit from Lin's husband, but determined that it in fact hurt Lin's claim by contradicting her testimony regarding the couple's marital status. In any event, we have previously held that "evidence offered as corroborating evidence [must] be objective . . . for it to be considered by the immigration judge and BIA. Letters and affidavits from family and friends are not objective evidence in this context." Djadjou v. Holder, 662 F.3d 265, 276 (4th Cir. 2011) (citation and quotation marks omitted). And although Lin is correct in noting that the agency did not specifically analyze every single item in the record, the IJ cataloged all of the evidence at the start of his opinion and reached his conclusion in light of "the totality of the evidence." Gandziami-Mickhou, 445 F.3d at 358. We therefore hold that the agency's finding was supported by substantial evidence and is not manifestly contrary to law. Djadjou, 662 F.3d at 275.

Accordingly, we affirm the agency's denial of the Petitioner's claim for asylum and for protection under the CAT.

She also necessarily fails to meet the more stringent burden of proof required to qualify for withholding of removal.

IV.

Finally, Lin argues that her due process rights were violated by the IJ's decision allowing the government to submit supplemental evidence after the August 31, 2010 merits hearing. Aliens are entitled to due process of law in deportation proceedings. Demore v. Kim, 538 U.S. 510, 523 (2003) (citing Reno v. Flores, 507 U.S. 292, 306 (1993)). A petitioner's due process rights are violated when she is not "accorded an opportunity to be heard at a meaningful time and in a meaningful manner," such that she did not "receive a full and fair hearing on [her] claims." Rusu v. United States I.N.S., 296 F.3d 216, 320 (4th Cir. 2002).

Lin's argument is without merit. First, IJs have discretionary authority to set and extend deadlines for the submission of evidence in their courts. See 8 C.F.R. § 1208.13(a). Second, the IJ held an additional hearing to allow the new evidence to be fully examined and give Lin an opportunity to explain her prior statements. The parties were afforded several months to prepare for the hearing. In light of this, Lin has not shown how the IJ's decision limited her right

23

to be heard in a meaningful manner.  We therefore reject her due process argument.

V.

For the reasons stated, we deny Lin's petition for review.

PETITION DENIED

THACKER, Circuit Judge, concurring:

This court's review of the agency's adverse credibility determination entails a relatively simple inquiry: whether substantial evidence, exemplified by "specific, cogent reason[s]," exists to support the agency's findings. Singh v. Holder, 699 F.3d 321, 328 (4th Cir. 2012) (alteration in original). Here, although the IJ identified a host of secondary factors that negatively impacted Lin's credibility, he identified two primary reasons -- each stemming from Lin's initial border interview -- for his adverse credibility finding: (1) the abortion omission and (2) the marriage discrepancy. Although I find the circumstances of the interview questionable, and I am of the view that such border interviews should be considered with caution, I ultimately agree with my colleagues' conclusion that the agency's findings in this case are supported by substantial evidence. For this reason, and because I agree with the majority's analysis as to the other issues on appeal, I concur.

I.

A so-called "airport" or "border" interview takes place "when an alien is deemed inadmissible immediately upon entering the United States and indicates an intention to apply for asylum or a fear of persecution." Diallo v. Gonzales, 445 F.3d 624, 631 (2d Cir. 2006). As my colleagues recognize, the

25

circuit courts of appeals have uniformly held that these particular interviews should be carefully scrutinized for reliability before being utilized by the fact-finder to evaluate an applicant's credibility. See, e.g., Joseph v. Holder, 600 F.3d 1235, 1243 (9th Cir. 2010); Tang v. Attorney General, 578 F.3d 1270, 1279 (11th Cir. 2009); Moab v. Gonzales, 500 F.3d 656, 660-61 (7th Cir. 2007); He Chun Chen v. Ashcroft, 376 F.3d 215, 223-24 (3d Cir. 2004); Ramsameachire v. Ashcroft, 357 F.3d 169, 179 (2d Cir. 2004). The reason for this special attention is straightforward:

> The interview takes place immediately after an alien has arrived in the United States, often after weeks of travel, and may be perceived by the alien as coercive or threatening, depending on the alien's past experiences. Moreover, at the interview, the alien is not represented by counsel, and may be completely unfamiliar with United States immigration laws and the elements necessary to demonstrate eligibility for asylum. Finally, because those most in need of asylum may be the most wary of governmental authorities, the BIA and reviewing court must recognize, in evaluating the statements made in an interview, that an alien may not be entirely forthcoming in the initial interview.

Ramsameachire, 357 F.3d at 179.

In Ramsameachire, one of the leading decisions in this area, the Second Circuit set forth a non-exhaustive list of factors for assessing the reliability of airport interviews:

> First, a record of the interview that merely summarizes or paraphrases the alien's statements is inherently less reliable than a verbatim account or transcript. Second, similarly less reliable are interviews in which the questions asked are not

26

designed "to elicit the details of an asylum claim," or the INS officer fails to ask follow-up questions that would aid the alien in developing his or her account. Third, an interview may be deemed less reliable if the alien appears to have been reluctant to reveal information to INS officials because of prior interrogation sessions or other coercive experiences in his or her home country. Finally, if the alien's answers to the questions posed suggest that the alien did not understand English or the translations provided by the interpreter, the alien's statements should be considered less reliable.

Id. at 180 (internal citations omitted).[*] Importantly, the Second Circuit "do[es] not regard these factors as essential to be assessed in every case, but simply as helpful matters to be considered where appropriate." Guan v. Gonzales, 432 F.3d 391, 396 (2d Cir. 2005).

## II.

In this case, I believe several of the factors outlined in Ramsameachire counsel in favor of scrutinizing Lin's initial interview with a particularly critical eye. I detail these factors not to disparage the majority's reasoning, but to emphasize the need to approach these interviews with extreme caution.

---

[*] The Second Circuit derived these factors from two Third Circuit decisions, Senathirajah v. INS, 157 F.3d 210 (3d Cir. 1998) and Balasubramanrim v. INS, 143 F.3d 157 (3d Cir. 1998), and its reasoning has been approved by several other circuit courts of appeals. See, e.g., Moab, 500 F.3d at 661 (considering the Ramsameachire factors); Singh v. INS, 292 F.3d 1017, 1022 (9th Cir. 2002) (considering the same Senathirajah and Balasubramanrim factors).

27

As a threshold matter, the discrepancies noted by the IJ are derived primarily from the handwritten notes of the translator contained in the document entitled "Translator Questions." Although portions of the document reflect Lin's verbatim responses to the questions asked, other portions slip into the third person and thus appear to be the translator's own "summar[ry]" or "paraphrase[]" of Lin's statements. Ramsameachire v. Ashcroft, 357 F.3d 169, 180 (2d Cir. 2004).

Second, the Translator Questions were not designed "to elicit the details of an asylum claim," nor is there any evidence the questioning officer "ask[ed] follow-up questions that would aid [Lin] in developing . . . her account." Ramsameachire, 357 F.3d at 180. For example, the border patrol agent asked Lin, "If you are sent back to your country, do you fear that you will be persecuted or tortured?" JA 235. This question is directed at future -- not past -- persecution, i.e., Lin's fears with respect to being "sent back" to China. Lin's answer, although muddled, reflects her desire to have more children and her belief "she would be forced into abortion or [tubal] ligation" in China. Id. The documents from the border interview do not indicate the agent asked Lin any follow-up questions with respect to this "future fear" question, nor do they indicate she was asked any questions at all with respect to past persecution. Rather, the translator's questions came from

28

a pre-printed worksheet focused on obtaining basic identifying and immigration information. This perfunctory series of questions is a fairly archetypal border interview -- and the reason so many courts have stressed that such an interview is not the equivalent of an application for asylum. See, e.g., Singh v. INS, 292 F.3d 1017, 1023 (9th Cir. 2002) (an airport interview "d[oes] not necessarily contain questions 'designed to elicit the details of an asylum claim'" (quoting Balasubramanrim v. INS, 143 F.3d 157, 162 (3d Cir. 1998)).

Finally, the overall circumstances of Lin's border interview deserve mention. She was seized by armed agents immediately after crossing the Rio Grande, handcuffed, and transported by police car to the border patrol station. She testified she had never seen a firearm before and described in detail the terror she felt during the initial detention and questioning. If Lin's subsequent account of her experience at the hands of the Chinese government is to be believed, she may well have had valid reasons to be less than forthcoming with governmental authorities in such a situation. See Ramsameachire, 357 F.3d at 179.

In this case, the IJ, albeit not in so many words, acknowledged each of the above circumstances and concluded, nevertheless, that the border interview was sufficiently reliable so as to serve as a basis for his adverse credibility

29

determination.  The record here does not compel a contrary result.  See Niang v. Gonzales, 492 F.3d 505, 511 (4th Cir. 2007) ("[W]here the record plausibly could support two results: the one the IJ chose and the one [the petitioner] advances, reversal is only appropriate where the court find[s] that the evidence not only supports [the opposite] conclusion, but compels it." (alterations in original) (internal quotation marks and citation omitted)).  I also observe that, even if we were to follow the lead of the Eleventh Circuit in distinguishing between simple omissions and impermissible contradictions in the context of border interviews, see Tang v. Attorney General, 578 F.3d 1270, 1279 (11th Cir. 2009), Lin has offered no argument with respect to the IJ's reliance on the direct contradiction present in her marital status testimony.  Inasmuch as this contradiction alone, coupled as it is with the myriad secondary factors identified by the IJ, would be sufficient to support the agency's findings, see Djadjou v. Holder, 662 F.3d 265, 273-74 (4th Cir. 2011), I see no grounds for reversing the credibility determination in this case.

## III.

The issue in the present case, as in so many immigration cases, turns on the standard of review.  While the IJ could have -- and perhaps should have -- engaged in a more detailed analysis of his reasons for relying on the border

30

interview, I am satisfied the record of this case reflects that the appropriate factors were adequately considered.  I thus concur in denying the petition for review.